Slip Op. 17-142

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ÖZDEMIR BORU SAN. VE TIC. LTD. STI., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br>    and <br><br> ATLAS TUBE and <br> INDEPENDENCE TUBE CORPORATION, <br><br>    Defendant-Intervenors. | Before: Gary S. Katzmann, Judge <br><br> Court No. 16-00206 |

## OPINION

[Commerce's Final Determination is sustained in part and remanded in part. Plaintiff's Motion for Judgment on the Agency Record is denied in part.]

Dated: October 16, 2017

David L. Simon, Law Office of David L. Simon, of Washington, DC, argued for plaintiff. With him on the brief was Mark B. Lehnardt of Washington, DC.

Kelly Ann Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, and Tara K. Hogan, as Senior Trial Counsel. Of counsel on the brief was Emily R. Beline, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC. With them on the supplemental brief was Robert E. Kirschman, Jr., Director. Of counsel on the supplemental brief was Brandon J. Custard, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Cynthia C. Galvez, Attorney, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor Independence Tube Corp. With her on the brief were Timothy C. Brightbill and Alan H. Price.

John W. Bohn, Attorney, Schagrin Associates, of Washington, DC, argued for defendant-intervenor Atlas Tube. With him on the brief was Roger B. Schagrin.

Katzmann, Judge:   The Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, § 502, 129 Stat. 362, 383–84 (2015), which was signed into law on June 29, 2015, made numerous amendments to the antidumping and countervailing duty laws found under Title 19 of the United States Code. Specifically, 19 U.S.C. § 1677e(b) and (c) were amended, and (d) was added.[1] In what appears to be a matter of first impression, the countervailable subsidy case now before the court provides an occasion to consider these TPEA amendments as they concern the application, by the United States Department of Commerce ("Commerce"), of facts available and adverse inferences to a respondent company.

Plaintiff, Özdemir Boru San. ve Tic. Ltd. Sti ("Özdemir"), a Turkish producer and exporter to the United States of heavy walled rectangular welded carbon steel pipes and tubes ("HWR pipes and tubes"), brought this action against Defendant, the United States ("the Government"), on October 9, 2016, challenging elements of Commerce's final determination in Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Affirmative Countervailing Duty Determination, 81 Fed. Reg. 47,349 (Dep't Commerce July 21, 2016) (final results of investigation), and the subsequent Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 81 Fed. Reg. 62,874 (Dep't Commerce Sept. 13, 2016) ("Final Determination"), as well as the corresponding Issues and Decision Memorandum

---

[1] These TPEA amendments affect all antidumping and countervailing duty determinations made on or after August 6, 2015. See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug 6, 2015).

for the Final Determination, July 14, 2016, P.R. 241 ("IDM").  Summons, ECF No. 1; Complaint

¶ 1, ECF No. 5 ("Compl.").  Specifically, Özdemir argues that Commerce's application of adverse

facts available ("AFA") to Özdemir regarding the Turkish Exemption from Property Tax ("EFPT")

program, and Commerce's inclusion of two particular land parcels in the Land for Less-than-

Adequate-Remuneration ("LTAR") benchmark, are actions unsupported by record evidence and

contrary to law.  Compl. ¶¶ 21–24.  Özdemir thus asks this court to hold unlawful the Final

Determination on these grounds, and to remand it to the agency for a redetermination consistent

with the court's judgment. Compl. at 6. The Government, and defendant-intervenors Independence

Tube Corporation ("Independence") and Atlas Tube Corporation ("Atlas") oppose Özdemir's

motion.

 For the reasons set forth hereafter, the court finds that the Final Determination is supported

by substantial evidence[2] and in accordance with law with respect to the AFA issue, but not with

respect to the Land for LTAR issue, and thus remands it to Commerce.

**BACKGROUND**

A.  Statutory and Regulatory Framework

 1.  Countervailable Subsidies:  Basic Principles

 If Commerce determines that the government of a country is providing, directly or

indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a

class or kind of merchandise imported, or sold, or likely to be sold for import, into the United

States, and the International Trade Commission determines that an industry in the United States is

materially injured or threatened with material injury thereby, then Commerce shall impose a

countervailing duty ("CVD") upon such merchandise equal to the amount of the net

---

[2] Regarding the substantial evidence standard of review, see infra p.19.

countervailable subsidy.  See Section 701 of the Tariff Act of 1930, as amended, 19 U.S.C. §

1671(a) (2012).[3]  Generally, a subsidy is countervailable if it consists of a foreign government's

financial contribution to a recipient, which is specific, and also confers a benefit upon the recipient,

as defined under 19 U.S.C. § 1677(5).  A benefit is conferred when, in the case where goods or

services are provided, such goods or services are provided for less than adequate remuneration.

19 U.S.C. § 1677(E)(iv).  Furthermore, the statute states that:

> [T]he adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Id.  The regulation on "adequate remuneration" states that:

> [Commerce] will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions. In choosing such transactions or sales, [Commerce] will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i) (2015).

The subsidy must also be "specific" as defined under 19 U.S.C. § 1677(5A).  In the case

of domestic subsidies like those alleged in this case, a specific subsidy can be one that is "limited

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2017 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 502, 129 Stat. 362, 383–84 (2015), which are integral to this case.

to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D)(iv). An investigation of countervailable subsidies shall commence whenever an interested party files a petition with Commerce, on behalf of an industry,[4] which alleges the elements necessary for the imposition of the duty, and which is accompanied by information reasonably available to the petitioner supporting those allegations. 19 U.S.C. § 1671a(b)(1), (c)(2).

    2.    Legal Standard for Application of Facts Available and Adverse Inferences

During the course of its countervailing duty proceeding, Commerce requires information from both the producer respondent and the foreign government alleged to have provided the subsidy. See Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369–70 (Fed. Cir. 2014). Information submitted to Commerce during an investigation is subject to verification. 19 U.S.C. § 1677m(i)(1).

When a respondent: (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that cannot be verified, then Commerce shall "use the facts otherwise available [FA] in reaching the applicable determination." 19 U.S.C. § 1677e(a)(2).[5] Unaltered by

---

[4] "The term 'industry' means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A).

[5] 19 U.S.C. § 1677e(a) provides:

    If--
        (1) necessary information is not available on the record, or
        (2) an interested party or any other person--
            (A) withholds information that has been requested
            by [Commerce] . . .

the TPEA, this FA subsection thus asks whether necessary or requested information is missing from the administrative record, and provides Commerce with a methodology to fill the resultant informational gaps.  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Under certain circumstances, in an investigation, Commerce may determine to assign an AFA rate to an investigated respondent as to a given subsidy program, instead of the countervailable subsidy rate that the respondent might receive for that program under normal circumstances.  Typically, an AFA rate is higher than the normally calculable subsidy rate for an investigated program, and thus ultimately results in a higher CVD rate.  See 19 U.S.C. § 1677e (addressing both FA and AFA).

Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available," AFA,  if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[.]" Id. § 1677e(b)(1)(A).[6]  A respondent's failure to cooperate to "the best of its ability" is "determined by

---

> (B) fails to provide such information by the
> deadlines for submission of the information or in
> the form and manner requested . . .
> (C) significantly impedes a proceeding under this
> subtitle, or
> (D) provides such information but the information
> cannot be verified . . .

> [Commerce] . . . shall . . . use the facts otherwise available in
> reaching the applicable determination under this subtitle.

[6] 19 U.S.C.  § 1677e(b)(1)  provides:

> In general

> If [Commerce] . . . finds that an interested party has failed to
> cooperate by not acting to the best of its ability to comply with a

assessing whether [it] has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." Nippon Steel, 337 F.3d at 1382.

When applying an adverse inference, Commerce may rely on information from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record. 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)-(2) (2015). Relevantly, section 502 of the TPEA amended 19 U.S.C. § 1677e(b) to provide that Commerce "is not required to determine, or make any adjustments to, a countervailable subsidy rate . . . based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information." 19 U.S.C. § 1677e(b)(1)(B).

Pursuant to subsection (c), if the information relied upon is secondary -- as opposed to primary information, which is obtained in the course of the investigation -- then Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c)(1) (emphasis added). As regards the issues in this case, the TPEA did not substantially amend the corroboration requirement.[7]

---

request for information from [Commerce] . . . [Commerce] . . . in reaching the applicable determination under this subtitle—

(A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available; and
(B) is not required to determine, or make any adjustments to, a countervailable subsidy rate . . . based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

(emphasis added).

[7] The TPEA added to 19 U.S.C. § 1677e(c) an exception to the corroboration requirement, specifically that "[Commerce] . . . shall not be required to corroborate any dumping margin or countervailing duty applied in a separate segment of the same proceeding." 19 U.S.C. § 1677e(c)(2). This added subsection is not relevant to the instant proceeding.

If Commerce uses an adverse inference, then in selecting among the facts otherwise available, and ultimately choosing an AFA rate, the agency utilizes the statutory authorization found in subsection (d), which was added to the statute by the TPEA. Per subsection (d)(1), Commerce

> [m]ay . . . (i) use a countervailable subsidy rate applied for <u>the same or similar program</u> in a countervailing duty proceeding involving the same country; or (ii) <u>if there is no same or similar program</u>, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use[.]

19 U.S.C. § 1677e(d)(1)(A)(i)–(ii) (emphasis added). In carrying out this AFA rate selection procedure, Commerce may select "the highest such rate" made available. 19 U.S.C. § 1677e(d)(2). In doing so, Commerce "is not required . . . to estimate what the countervailable subsidy rate . . . would have been if the interested party found to have failed to cooperate . . . had cooperated," or to demonstrate that the countervailable subsidy rate used as an AFA rate "reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3).

Prior to the enactment of the TPEA, Commerce articulated a policy that it employs when selecting AFA rates. Commerce still follows this policy, and employed it in the underlying proceeding:

> In selecting AFA rates for programs on which a company has failed to fully cooperate, it is [Commerce's] practice to use the highest calculated program-specific rates determined for a cooperating respondent in the same investigation, or, if not available, <u>rates calculated in prior CVD cases involving the same country</u>. Specifically, [Commerce] applies the highest calculated rate for the identical program in the investigation if a responding company used the identical program, and the rate is not zero.

> If there is no identical program match within the investigation, or if the rate is zero, [Commerce] uses the highest non-de minimis rate calculated for the identical program in another CVD proceeding involving the same country.

> If no such rate is available, [Commerce] will use the highest non-de minimis rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country.
>
> Absent an above-de minimis subsidy rate calculated for a similar program, [Commerce] applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies.

IDM at 4 (citations omitted) (emphasis added).

Commerce has explained the rationale behind its AFA policy:

> [Commerce's] practice when selecting an adverse rate from among the possible sources of information is to ensure that the result is sufficiently adverse "as to effectuate the statutory purposes of the AFA rule to induce respondents to provide the Department with complete and accurate information in a timely manner."

Id. (citations omitted). Importantly, Commerce maintains that its practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Id. (quoting Statement of Administrative Action, accompanying the Uruguay Round Agreements Act, H.R. No. 103–316, vol. 1, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. at 4199 ("SAA"));[8] compare 19 U.S.C. § 1677e(d)(3).

B.    Prior Proceedings

On July 21, 2015, Atlas, Independence, and additional petitioners,[9] filed with Commerce a CVD petition concerning imports of HWR pipes and tubes from the Republic of Turkey ("Turkey"). See Petition for the Imposition of Antidumping and Countervailing Duties Pursuant

---

[8] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

[9] Bull Moose Tube Company, EXLTUBE, Hannibal Industries, Inc., Maruichi American Corporation, Searing Industries, Southland Tube, and Vest, Inc. See IDM at 1.

to Sections 701 and 731 of the Tariff Act of 1930, as Amended July 21, 2015 Volume V –

Information Relating to the Republic of Turkey – Countervailing Duties, P.R. 9 ("Petition"); CVD

Investigation Initiation Checklist (Aug. 10, 2015), P.R. 31, C.R. 22 ("Initiation Checklist").

Commerce initiated its investigation on August 17, 2015. Heavy Walled Rectangular

Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Initiation of Countervailing

Duty Investigation, 80 Fed. Reg. 49,207 (Dep't Commerce Aug. 17, 2015). The period of

investigation ("POI") was January 1, 2014 through December 31, 2014. Id. Commerce selected

Özdemir as one of two mandatory respondents in the investigation,[10] pursuant to section 19 U.S.C.

§ 1677f-1(e)(2)[11] and 19 C.F.R. § 351.204(c)(2) (2015).[12] IDM at 2.

---

[10] The other company was MMZ Onur Boru Profil uretim San Ve Tic. A.S. IDM at 2. MMZ is not otherwise relevant to the instant proceeding.

[11] 19 U.S.C. § 1677f-1(e)(2) provides:

> If [Commerce] determines that it is not practicable to determine individual countervailable subsidy rates . . . because of the large number of exporters or producers involved in the investigation or review, [Commerce] may--
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to--
> > > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> > > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; . . .

[12] 19 C.F.R. § 351.204(c)(2) provides:

> Exporters and producers examined--
> > (1) In general. In an investigation, [Commerce] will attempt to determine an . . . individual countervailable subsidy rate for each known exporter or producer of the subject merchandise. . . .

On September 9, 2015, Commerce issued a CVD Questionnaire to respondents and the Government of Turkey ("GOT"). Countervailing Duty Questionnaire Countervailing Duty (CVD) Investigation Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republica of Turkey C-489-823, P.R. 37 ("Questionnaire"). The GOT filed its response to the Questionnaire on October 28, 2015, along with a number of supportive exhibits. P.R. 63, C.R. 27 ("GOT QR"); Law Concerning Incentives on Investments and Employment and on the Amendment of Certain Laws (Law No. 5084), P.R. 67, C.R.92 ("GOT QR Ex. 9); The provinces under the Article 2 of Law Concerning Incentives on Investments and Employment and on the Amendment of Certain Law (Law No. 5084), P.R. 125, C.R. 93 ("GOT QR Ex. 10"); Article 4 of Law No. 3365, P.R. 134 ("GOT QR Ex. 19"). By its counsel, Özdemir filed the following relevant substantive submissions: on October 30, 2015, its questionnaire response ("QR"), P.R. 134, C.R. 104, and on November 30, 2015, its response to Commerce's supplemental questionnaire ("SQR"), P.R. 186, C.R. 147.

On December 28, 2015, Commerce published its preliminary determination. Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Determination, 80 Fed. Reg. 80,749 (Dep't Commerce Dec. 28, 2015) ("Preliminary Determination"). It was accompanied by Commerce's memorandum, Countervailing Duty Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Decision Memorandum for the Preliminary Determination, dated December 18, 2015, P.R. 199 ("Preliminary Decision Memo"). The

---

(2) Limited investigation. Notwithstanding paragraph (c)(1) of this section, [Commerce] may limit the investigation by using a method described in . . . [19 U.S.C. § 1677f-1(e)].

foregoing two documents were accompanied by a third, company specific memorandum entitled Preliminary Determination Calculation Memorandum for Özdemir Boru Profil San. ve Tic. Sti., dated December 18, 2015, P.R. 202, C.R. 161 ("Preliminary Calculation Memo"). Özdemir was assigned a preliminary CVD rate of 1.35 percent.[13] Preliminary Determination at 80,750. Also on December 28, 2015, Özdemir filed a request for correction of ministerial error. Compl. ¶ 12.

In the Preliminary Decision Memo, Commerce preliminarily determined under the Provision of Land for LTAR program that the Zonguldak organized industrial zone ("OIZ") land sold to Özdemir in 2008 constituted a financial contribution within the meaning of 19 U.S.C. § 1677(5)(E)(iv),[14] and that it was specific under § 1677(5A)(D)(iv).[15] Commerce further preliminarily determined that the program conferred a benefit upon Özdemir to the extent that the land in question was sold to Özdemir for LTAR as described under 19 U.S.C. § 1677(5)(E)(iv). In making an LTAR determination, Commerce compares the price actually paid to a benchmark

---

[13] MMZ Onur Boru Profil uretim San Ve Tic. A.S. received a subsidy rate of 7.69 percent. Preliminary Determination at 80,750. Companies not individually-investigated were assigned an "all-others" rate of 4.39 percent, calculated by weighing the subsidy rates of the individual companies selected as respondents by those companies' exports of the subject merchandise to the United States. Id.

[14] 19 U.S.C. § 1677(5)(E)(iv) provides:

> A benefit shall normally be treated as conferred where there is a benefit to the recipient, including -- . . .
> > (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

[15] 19 U.S.C. § 1677(5A)(D)(iv) provides:

> Where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific.

value, pursuant to 19 C.F.R. § 351.511(a). As a benchmark, Commerce used land values that it had previously used in its investigation of line pipe from Turkey, Welded Line Pipe from the Republic of Turkey: Final Affirmative Countervailing Duty Determination, 80 Fed. Reg. 61,371 (Dep't Commerce Oct. 13, 2015). See Preliminary Decision Memo at 11–12. Commerce preliminarily determined Özdemir's net subsidy rate under this program to be 0.55 percent ad valorem. Id. at 12.

As to the EFPT program at issue in this case, Commerce preliminarily concluded that Özdemir had not used it, based on Özdemir's responses to Commerce's questionnaires. Preliminary Decision Memo at 16. Specifically, in response to Commerce's questions regarding that program, Özdemir stated that:

> [It] did not receive any benefits under this program. Eligibility for this program is limited to enterprise located within certain designated regions. Since none of the Özdemir's plants are located in those regions, Özdemir was not eligible to use this program.

QR at 33.

Commerce subsequently conducted verifications of Özdemir's QR. Verification of the Questionnaire Responses of Özdemir Boru Profil San ve Tic. Ltd Sti. (Mar. 10, 2016), P.R. 227, C.R. 235 ("Verification Report"); Verification Exhibit 2, C.R. 173–75; Verification Exhibit 10, C.R. 173, 191–92; Verification Exhibit 15, C.R. 203. During verification, Commerce discovered that Özdemir was eligible for, and did receive, an EFPT subsidy during the five years prior to the period of investigation, because it possessed buildings in the Zonguldak OIZ in Turkey. Verification Report at 2, 9. Commerce determined that Özdemir was unable to demonstrate at verification that it had not received this subsidy during the POI as well. Ministerial Error Allegations in the Final Determination (Aug. 19, 2016), P.R. 252 at 5 ("Min. Error Dec. Memo").

On March 24, 2016, Özdemir filed its case brief.  P.R. 233, C.R. 237.  The GOT filed its case brief the same day.  P.R. 232.

On July 21, 2016, Commerce published its original final determination, wherein the agency continued to find that Özdemir was subsidized by reason of its purchase of certain real property from the government at LTAR, and assigned Özdemir a subsidy rate of 0.54 percent ad valorem for that program.  IDM at 15.  Regarding the EFPT program, Commerce determined that "Özdemir withheld information requested by" the agency and thus had failed to cooperate to the best of its ability in reporting benefits under this program.  Id. at 5; see 19 U.S.C. § 1677e(a)(2)(A).  Commerce consequently assigned Özdemir an AFA rate for the EFPT program, and, being unable to locate an above-de minimis application of that same program in a Turkish proceeding, resorted to the third tier of its hierarchy.  IDM at 6–7; see 19 U.S.C. § 1677e(b).  Under that tier, Commerce uses the highest non-de minimis rate for a similar program, based on treatment of the benefit, in another CVD proceeding involving the same country.  IDM at 6.  Commerce selected an AFA CVD rate of 14.01 percent, derived from Final Affirmative Countervailing Duty Determinations; Certain Welded Carbon Steel Pipe and Tube Products From Turkey, 51 Fed. Reg. 1268, 1270 (Jan. 10, 1986) ("CWP&T 1986").  IDM at 7 n.29.  In that determination, 14.01 percent was the program-specific rate applied for the Export Tax Rebate and Supplemental Tax Rebate program.  In applying that programmatic rate, Commerce found that the CWP&T 1986 program and the EFPT program were "[a] match, based on program type and treatment of benefit."  Id. at 7.

Commerce next addressed corroboration of the selected CWP&T 1986 rate per 19 U.S.C. § 1677e(c).  IDM at 8.  Commerce noted that in determining the reliability of the selected rate, "there typically are no independent sources for data on company-specific benefits resulting from countervailable subsidy programs."  Id.  However, Commerce determined that "no information

has been presented which calls into question the reliability of these previously calculated subsidy rates that we are applying as AFA." Id. As to relevance, Commerce found that, "[f]or those programs which the [agency] found a program-type match, . . . because these are the same or similar programs, they are relevant to the programs under investigation in this case." Id. "Due to the lack of certain record information concerning the programs under investigation," Commerce "corroborated the rates it selected to the extent practicable." Id.; see 19 U.S.C. § 1677e(c)(1).

As to the Provision of Land for LTAR program, Commerce determined Özdemir's net subsidy rate to be 0.54 percent ad valorem. IDM at 15.

Özdemir subsequently alleged that Commerce made a ministerial error with respect to its application of AFA to the EFPT program. Min. Error Dec. Memo. Commerce acknowledged that it inadvertently characterized its application of an adverse inference to the EFPT program as resulting from Özdemir's failure to follow questionnaire instructions to report all "other subsidies" received from the GOT, but concluded that an adverse inference was nonetheless appropriate because Özdemir failed to respond accurately to specific questions about that program in its initial questionnaire response. Min. Error Dec. Memo at 4–5, 5 n.21. Accordingly, Commerce published the amended Final Determination, in which it did not change the subsidy rate for Özdemir, on September 13, 2016.

On October 9, 2016, within thirty days after the publication of the CVD order, Özdemir timely filed its summons. Sum.; see 19 U.S.C. § 1516a(a)(2)(A); USCIT Rule 3(a)(2). Özdemir filed its complaint the same day. Compl. Atlas moved to intervene as defendant-intervenor on October 28, and the court granted the motion the same day. ECF Nos. 7, 11. Independence filed a motion to intervene as defendant-intervenor on November 8, and the court granted it the next day. ECF Nos. 12, 15. Pursuant to USCIT Rule 56.2, Özdemir filed its motion for judgment on

the agency record on February 21, 2017.  ECF Nos. 26, 27 ("Pl.'s Br.").  The Government filed its responsive brief in opposition on May 28.  ECF No. 33 ("Def.'s Br.").  Independence and Atlas filed their respective responsive briefs in opposition on May 30.  ECF Nos. 34, 35 ("Independence Br." and "Atlas Br.").  Özdemir filed its reply on June 26.  ECF Nos. 36, 37 ("Pl.'s Reply").  Oral argument was held before the court on September 12, 2017.  ECF No. 52.

Özdemir argues before this court that the <u>Final Determination</u> was unsupported by substantial evidence, and was contrary to law, in regards to the application of AFA to Özdemir regarding the EFPT program, and in the inclusion of certain land parcels in the benchmark for the Land for LTAR program.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), and 19 U.S.C. § 1516a(a)(2)(A)(i)(II), and will sustain Commerce's countervailable subsidy determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); <u>Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States</u>, 701 F.3d 1367, 1374 (Fed. Cir. 2012).

## DISCUSSION

I.     **The Application of AFA to Özdemir is Supported by Substantial Evidence and in Accordance with Law.**

A.   <u>Commerce's Use of Facts Otherwise Available is Supported by Substantial Evidence.</u>

1.   <u>Parties' Arguments</u>

Özdemir argues that it correctly reported its "non-use" of the EFPT program, and placed all necessary documentation on the record.  Pl.'s Br. at 21–24.  Özdemir explains that Commerce asked in the Questionnaire, under the heading of "Program-Specific Questions," that it report only on subsidies received <u>during the POI</u>, calendar year 2014:

> For each program, if your company (including cross-owned affiliate required to respond, as well as all trading companies) did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed.

Questionnaire at Sec. III p.7. Özdemir argues that it followed this instruction, answering that "Özdemir did not receive any benefits under [the EFPT] program." QR at 33; Pl.'s Br. at 23. The Property Tax Law creating this subsidy program provides a 0.2 percent property tax exemption on buildings built in an OIZ for the first five years following completion of construction. GOT QR at 84. Özdemir thus submits that because it completed its building on the OIZ property in 2008, SQR at 5, the company was exempted from paying property tax on it specifically from 2009 through 2013. GOT QR at 76–84; GOT QR Ex. 19; Pl.'s Br. at 22. As Commerce confirmed: "Özdemir did not make any tax payments for buildings located at its facility in the Zonguldak OIZ for the first five years following completion of the buildings' construction (i.e., December 24, 2008)." Verification Report at 9; see Verification Exhibit 10 at 534 (acknowledging that Özdemir had "completed construction of factory and begun production" as of December 25, 2008); Pl.'s Br. at 22.

Özdemir asserts in conjunction that because the exemption is a tax program, Petition at 24,[16] Initiation Checklist at 25, Questionnaire at 14, and thus a recurring subsidy, the benefit is expensed in the year received. 19 C.F.R. § 351.524(a) (2015) ("[Commerce] will allocate (expense) a recurring benefit to the year in which the benefit is received."); Pl.'s Br. at 23. Therefore the benefit was used at the latest in 2013, prior to the POI. Pl.'s Br. at 23. Özdemir points to the QR and the GOT QR, and argues that the record "contains every element necessary

---

[16] "The benefit equaled the difference between the amount that would have been paid in taxes without the program and the amount actually paid." Petition at 24.

for an exact calculation of any putative benefit attributable" to the EFPT program.[17] Id. Further,

per Özdemir, the amount of any subsidy so calculated would be well below the level of

countervailability. Pl.'s Br. at 24.

Independence argues that Özdemir now attempts to artificially reduce its incorrect QR

statement to the point that it did not receive benefits under the EFPT program during the POI,

ignoring the portion of that statement where it stated that it was altogether ineligible for the

program for geographic reasons. Independence Br. at 10. Independence also refers to Commerce's

specific instructions that "[it is] investigating alleged subsidies received over a time period

corresponding to the AUL," meaning for the POI and the preceding 14 years. Questionnaire at

Sec. II, p. II-2; Independence Br. at 10. Atlas argues that Özdemir's incorrect QR statement could

not be verified, and thus triggered 19 U.S.C. § 1677e(a)(2)(D).[18] Atlas Br. at 12–14. Further,

because Özdemir did not attempt correction until verification, after the responsive deadline had

passed, Verification Report at 2, 9, Atlas argues that 19 U.S.C. § 1677e(a)(2)(B) was also triggered.

Atlas Br. at 13.[19] Atlas also argues that 19 U.S.C. § 1677e(a)(2)(C) was implicated, since even if

---

[17] Özdemir also contends that it cannot be said to have impeded the investigation, see 19 U.S.C. § 1677e(a)(2)(C), because it provided an accurate QR response regarding EFPT benefits during the POI. Pl.'s Br. at 25.

[18] Atlas notes that "Commerce is given wide latitude to determine its verification procedures," meaning that the agency possesses significant discretion in administering that element of the investigative process. Atlas Br. at 16 (quoting Max Fortune Indus. Co. v. United States, Slip Op. 13-52, 2013 WL 1811907 at *3 (Apr. 15, 2013)). The court owes Commerce's verification decisions "considerable deference." Atlas Br. at 16 n.37 (quoting Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).

[19] Both defendant-intervenors argue that the record does not, in fact, show that Özdemir did not receive a benefit from the EFPT program during the POI. Independence asserts that "it is fair to assume that Özdemir did receive a benefit under the [EFPT] program during the POI" because the record does not demonstrate that the company paid property taxes specifically on its factory location in the OIZ. Independence Br. at 11 (citing Min. Error Dec. Memo. at 4–5).

Atlas submits the record does not definitively demonstrate that the EFPT program applies only during the first five years following construction, as it would have had to in this case to

Özdemir's incorrect QR response regarding the receipt of EFPT benefits were verifiable, Özdemir regardless "significantly impede[d]" the CVD investigation. Atlas Br. at 21. This is because Commerce's verification team, upon its arrival in Turkey, would have required an entirely different set of information in order to verify that Özdemir had not received an EFPT program benefit during the POI.[20] Atlas Br. at 22.

The Government argues that Commerce's conclusion that Özdemir withheld information and failed to cooperate to the best of its ability in providing the requested information about use of the EFPT program is supported by substantial evidence on the record. IDM at 5–6; Def.'s Br. at 10–11. The Government also argues that Commerce should not have been required to calculate the allegedly de minimis subsidy rate based on record evidence, as Özdemir contends it could and should have, because Commerce's resort to facts otherwise available was statutorily authorized and reasonable in light of Özdemir's QR misstatement. Def.'s Br. at 11.

2. Analysis

The court concludes that Commerce's application of AFA is supported by substantial evidence on the record. Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "A

---

precede the POI. Atlas Br. at 17–19. Atlas adds that "Commerce did not verify that Özdemir's 2013 property taxes were due in 2013, rather than in 2014," nor did it verify the value that Özdemir purports its building carries. Atlas Br. at 20–21.

Because this possibility does not implicate the triggering of Commerce's resort to facts otherwise available under 19 U.S.C. § 1677e(a), the court does not reflect in depth on defendant-intervenors suggestions regarding EFPT benefits received during the POI.

[20] In response to Özdemir's argument that the portions of its QR incorrectly linking the EFPT program to geographic location are not relevant to the question of whether a benefit was received during the POI, Atlas argues that the statute expressly contemplates that the conditions for application of facts otherwise available under § 1677e(a)(2) apply even where (a)(1) does not, meaning AFA may apply even where Commerce cannot find that "necessary information is not available on the record." Atlas Br. at 15.

finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)). However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619–20 (1966)).

Commerce "shall . . . use the facts otherwise available" if one of the criteria spelled out in 19 U.S.C. § 1677e(a)(1) or (2) are met. All parties agree that Özdemir provided an incorrect QR response regarding the EFPT program. QR at 32–33. The statute is triggered "[if] . . . an interested party . . . withholds information that has been requested by [Commerce]." Regarding the EFPT program, Commerce specifically requested that Özdemir answer questions found in the Questionnaire Standard Questions Appendix. QR at 33; Questionnaire at Sec. III pp.18–19. The questions therein do not request simple answers, but rather pose several questions requiring detailed answers about a firm's history with the program in question, benefits received thereunder, and records kept demonstrating those benefits. Questionnaire at Sec. III p.19. For the purposes of triggering facts otherwise available, it is of no moment that some part of Özdemir's incorrect QR statement supports the proposition that Özdemir did not receive EFPT benefits during the POI.

In fact, Özdemir's argument that the Questionnaire instructions demand responses only regarding the POI, Pl.'s Br. at 21, is undermined by Commerce's specific instruction that "[it is] investigating alleged subsidies received over a time period corresponding to the [15-year] AUL," meaning for the POI and the preceding 14 years. Questionnaire at Sec. II p.II-2. The contrast between Özdemir's brief, incorrect QR statement, and the detailed information that Commerce requested, as well as the explicitly noted AUL informational timeframe, constitute substantial evidence on the record that Özdemir "with[e]ld[] information that has been requested by [Commerce]" pursuant to 19 U.S.C. § 1677e(a)(2)(A).

The court is not persuaded by Özdemir's argument that Commerce could have referred to the record to calculate the precise countervailable subsidy received under the EFPT program, rather than rely on facts otherwise available. The possibility that the record does contain the information necessary to calculate a putative countervailable subsidy is irrelevant to the statutory triggers found in § 1677e(a), specifically whether "an interested party" such as Özdemir has "with[e]ld[] information that has been requested by [Commerce]." 19 U.S.C. § 1677e(a)(2)(A). Özdemir has provided no authority stating otherwise. [21] More to the point, because that possibility does not implicate the statutory standard, it does not detract from the substantiality of the evidence supporting the conclusion that Özdemir's incorrect QR response did trigger § 1677e(a)(2)(A). See CS Wind, 832 F.3d at 1373.

B. Commerce's Application of AFA is Supported by Substantial Evidence and in Accordance with Law.

---

[21] Indeed, § 1677e(a)(1), which triggers facts otherwise available where "necessary information is not available on the record," is read not in tandem with, but alternately to, (a)(2), as discernible by their separation with the conjunctive "or." See supra n.5. That necessary information is present in the record before Commerce, thus obviating § 1677e(a)(1), does not necessarily prevent the triggering of a subsection of (a)(2) as well.

1. Commerce's Decision to Apply an Adverse Inference is Supported by Substantial Evidence.

Özdemir argues that it fully cooperated in the investigation, and thus Commerce had no factual basis in the record to apply AFA under 19 U.S.C. § 1677e(b)(1). Pl.'s Br. at 24; see supra n.5. Özdemir acknowledges that its QR statement regarding EFPT benefits was in error, but submits that Commerce knew throughout the investigation that EFPT program qualification was based on location in an OIZ, and not on the province in which the property was located. Initiation Checklist at 25; Pl.'s Br. at 25. Özdemir again argues that the operative fact is that it did not receive an EFPT benefit during the POI, and notes that Commerce verified that any property tax exemption applicable to Özdemir would have ended before the POI began. Verification Report at 9; Pl.'s Br. at 26. Özdemir generally asserts also that it "did not hide any information from Commerce," having spent four pages in its QR explaining that one of its plants "is located in the Zonguldak OIZ," and that it provided all the payment and title information related to that property, including information establishing that construction of that building was completed in December 2008 -- thus cutting off the applicable property tax benefit before the POI began in 2014. Pl.'s Br. at 26; QR at 13–16, Exs. 8–10; SQR at 5.

Özdemir argues in its Reply that Commerce impermissibly applied a per se rule in determining that Özdemir "failed to act to the best of its ability" and therefore warranted an adverse inference. 19 U.S.C. § 1677e(b)(1); Pl.'s Reply at 16–17. Özdemir argues that, instead, the "best of its ability standard" calls for an assessment of materiality. Pl.'s Reply at 17.

The court is persuaded by the Government's argument that substantial evidence supports Commerce's decision to apply AFA. "If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], [then Commerce] . . . may use an inference that is adverse to the interests of that

party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A); see 19 C.F.R. § 351.308; QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (discussing burdens of proof in administrative proceedings before Commerce). Commerce "may employ [such] inferences . . . to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Viet I-Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1109 (Fed. Cir. 2016) (quoting SAA at 870). "Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." Maverick Tube, 857 F.3d at 1360 (quoting Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012)). Thus, "[t]he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." Id. (quoting F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum efforts to provide Commerce with full and complete answers to all inquiries in an investigation." Maverick Tube, 857 F. 3d at 1360 (quoting Nippon Steel, 337 F.3d at 1382).

Substantial evidence supports both Commerce's finding that Özdemir did not act to the best of its ability to comply with Commerce's request for information, and its decision to apply an adverse inference in consequence. As explained supra, the Questionnaire asks for a detailed series of answers regarding the respondent's history with the EFPT program. Questionnaire at 18–19. Özdemir stated in its QR that it "did not receive any benefits under [the EFPT] program. Eligibility for this program is limited to enterprises located within certain designated regions. Since none of the Özdemir's plants are located in those regions, Özdemir was not eligible to use this program." QR at 33. At verification, Commerce discovered that this response was not accurate, as Özdemir

had taken advantage of the EFPT program, and did have facilities in the designated region.[22] Verification Report at 2, 9. Commerce's resulting conclusion that Özdemir had withheld requested information, pursuant to 19 U.S.C. § 1677e(a)(2)(A), by failing to report use of the EFPT program was reasonable and supported by substantial evidence. IDM at 5. Accordingly, resort to facts otherwise available was warranted. Id. So too was Commerce's decision to apply an adverse inference reasonable. Id. at 6. The record shows that Özdemir did not "provide Commerce with full and complete answers to all inquiries in [the] investigation," as regards the EFPT program. Maverick Tube, 857 F.3d at 1360. While "[t]he best-of-one's-ability standard 'does not require perfection and recognizes that mistakes sometimes occur,' it "does not condone inattentiveness, carelessness, or inadequate record keeping." Papierfabrik Aug. Koehler SE v. United States, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (quoting Nippon Steel, 337 F.3d at 1382). In summary, "Commerce requested information from [Özdemir], which [Özdemir] did not provide, and never claimed that it was unable to provide."[23] Maverick Tube, 857 F.3d at 1360; IDM at 6; Verification Report at 2, 9. Commerce's decision to apply an AFA rate was therefore supported by substantial evidence on the record.

Özdemir's assertion that it inadvertently provided the incorrect QR statement regarding EFPT benefits does not advance its argument here. "While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not

---

[22] Commerce also determined that Özdemir was unable to provide information showing that it actually paid property taxes on the factory located in the Zonguldak OIZ during the POI. Min. Error Decision Memo at 5.

[23] The court notes that Özdemir could reasonably have provided corrected information regarding its use of the EFPT program in its SQR. See SQR at 5. However, Özdemir did not do so. Id.; see, e.g., Fresh Garlic Producers Ass'n v. United States, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1325 (2015).

contain an intent element." Nippon Steel, 337 F.3d at 1383, cited in Essar Steel, 678 F.3d at 1276.

Rather, "the statutory trigger for Commerce's consideration of an adverse inference is simply a

failure to cooperate to the best of respondent's ability, regardless of motivation or intent." Id. The

court also finds unpersuasive Özdemir's arguments that its incorrect QR statement was not

material, and thus could not justify an adverse inference. Pl.'s Reply at 14–16. Neither the statute

nor binding precedent impose that standard on Commerce; the animating inquiry of the adverse

inferences provision is whether "an interested party has failed to cooperate by not acting to the

best of its ability to comply with a request for information from [Commerce]." 19 U.S.C. §

1677e(b)(1); see Maverick Tube, 857 F.3d at 1360–61. Contrary to Özdemir's materiality

articulation, the "best of its ability" standard "expects respondents to '(a) take reasonable steps to

keep and maintain full and complete records . . . ; (b) have familiarity with all of the records it

maintains in its possession, custody, or control; and (c) conduct prompt, careful, and

comprehensive investigations of all relevant records that refer or relate to the imports in question.'"

Papierfabrik, 843 F.3d at 1379 (quoting Nippon Steel, 337 F.3d at 1382). Özdemir's emphasis on

EFPT benefits received during the POI is besides the point. Rather, the relevant point is that

Özdemir did not put forth its best efforts to provide "full and complete" answers to Commerce's

inquiries in its QR. Nippon Steel, 337 F.3d at 1382; see Essar Steel, 678 F.3d at 1276 ("Without

the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship

and lack of finality in its investigations.").

The court is likewise unpersuaded by Özdemir's argument that Commerce could have used

additional tax information provided at verification to ascertain its participation in the EFPT

program during the POI and beforehand. The purpose of verification is not to "continue the

information-gathering stage of [Commerce's] investigation." Borusan Mannesmann Boru Sanyive

Ticaret A.S. v. United States, 39 CIT ___, ___, 61 F. Supp. 3d 1306, 1349 (2015) (quoting agency position), aff'd, Maverick Tube, 857 F.3d 1353.   "Verification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response."  Tianjin Mach. Imp. & Exp. Corp. v. United States, 28 CIT 1635, 1644, 353 F. Supp. 2d 1294, 1304 (2004), aff'd, 146 F. App'x 493 (Fed. Cir. 2005).  "Commerce . . . is under no obligation to request or accept substantial new factual information from a respondent after discovering that a response cannot be corroborated during verification."  Id.; see 19 C.F.R. § 351.307(d) (2015).   Nor is it for this court to mold Commerce's verification procedures more strictly than the statute provides.   Indeed, the statute gives Commerce wide latitude in its verification procedures,  Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (citing American Alloys, Inc. v. United States, 39 F.3d 1469, 1475 (Fed. Cir. 1994)), and further "Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."  Id.  More generally, the Federal Circuit "ha[s] recognized Commerce's authority to apply adverse facts, even when a party provides relevant factual information if a party has not acted to the best of its ability to provide the information."  Essar Steel, 678 F.3d at 1278; see Nippon Steel, 337 F.3d at 1378–83.

The operative point is that Özdemir possessed information that Commerce requested in its Questionnaire, and upon being asked to provide that information with supportive details and explanations, Özdemir did not provide it.  QR at 33.   "Such behavior cannot be considered 'maximum effort to provide Commerce with full and complete answers.'"  Maverick Tube, 857 F.3d at 1361 (quoting Nippon Steel, 337 F.3d at 1382).  Commerce's decision to apply an adverse inference, and an AFA rate, was thus supported by substantial evidence on the record.

　　　2.　Commerce Selection of the AFA Rate was in Accordance with Law.

Commerce used the third level of its methodology in applying the CWP&T 1986 rate[24] to Özdemir in this proceeding.  IDM at 6–7 ("If no such rate is available, the Department will use the highest non-de minimis rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country.") (emphasis added).   In a two-pronged argument, Özdemir contends that even if it did not act to the best of its ability in responding to Commerce's Questionnaire, Commerce nonetheless violated its AFA selection criteria in assigning the 14.01 percent program-specific rate to Özdemir.  Pl.'s Br. at 27.

First, Özdemir argues that "Commerce should have stopped at its second preference," rather than reach the third, "because a rate had been calculated for an identical program in a prior CVD proceeding involving the same country."  Pl.'s Br. at 28.  That rate, per Özdemir, is a 0.01 percent subsidy rate applied to respondent Toscelik for the EFPT program in the investigation of oil country tubular goods ("OCTG").  Pl.'s Br. at 28 (citing Certain Oil Country Tubular Goods From the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) and accompanying IDM).  Özdemir asserts that a rate of 0.01 percent is not de minimis, and disputes the validity of Commerce's 0.5 percent de minimis threshold by asserting that "Commerce's practice is to treat programs with ad valorem subsidy rates below 0.005 [percent] as de minimis."  Pl.'s Br. at 29–30 (citing Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review, 77 Fed. Reg. 46,713 (Dep't Commerce Aug. 6, 2012)).  Özdemir contends that, though Commerce cited a previous usage of

---

[24] See supra p.14, regarding CWP&T 1986 (the 1986 Final Affirmative Countervailing Duty Determinations; Certain Welded Carbon Steel Pipe and Tube Products From Turkey, 51 Fed. Reg. 1268).

the 0.5 percent de minimis AFA threshold, it provided no reasoning in either the Final Determination or the cited decision explaining why that threshold should apply. Pl.'s Br. at 30 (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369 (Fed. Cir. 1998); U.H.F.C. Co. v. United States, 916 F.2d 689, 700 (Fed. Cir. 1990)).

Second, Özdemir argues that even if Commerce's selection of the CWP&T 1986 14.01 percent rate as AFA was justified, it was nonetheless inconsistent with Commerce's regulatory criteria. Pl.'s Br. at 30–31. Özdemir contends that the 1986 program was not a "match, based on program type and treatment of the benefit." IDM at 7. According to Özdemir, the "treatment" of a benefit refers to its attribution, which is fundamentally different between an export subsidy and a domestic subsidy. Pl.'s Reply at 8. Specifically, the 1986 Export Tax Rebate program was an export subsidy, rather than a domestic subsidy, attributed only to export sales rather than total sales. Pl.'s Br. at 31. Per Özdemir, "[t]he benefit from an export subsidy is attributed to a company's export sales only, while the benefit from a domestic subsidy is attributed to a company's total sales." Pl.'s Reply at 8 (citing 19 C.F.R. § 351.525(b)(2)–(3) (2015)).[25]

The court construes Özdemir's argument as an assertion that Commerce acted in an arbitrary and capricious fashion, and thus, not in accordance with law. When determining whether Commerce's interpretation and application of the statute is in accordance with law, this Court must consider "whether Congress has directly spoken to the precise question at issue," and, if not, whether the agency's interpretation of the statute is reasonable. Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1337, 1344 (Fed. Cir. 2017) (quoting Chevron U.S.A. Inc. v. Natural

---

[25] Furthermore, Özdemir argues that, under the fourth alternative, respondents could not "conceivably" use that program, as it was terminated nearly 30 years ago; if the rate could not "conceivably" be used under the fourth alternative, it could certainly not be "similar" under the third alternative. Pl.'s Br. at 31; Pl.'s Reply at 2.

Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)).  If the Court determines that the statute is silent or ambiguous with respect to the specific issue, then the traditional second prong of the Chevron analysis asks what level of deference is owed Commerce's interpretation.  Chevron, 467 U.S. at 842–43; see United States v. Mead Corp., 533 U.S. 218, 228 (2001).  "Chevron requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable." Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994); see Kyocera Solar, Inc. v. United States Int'l Trade Comm'n, 844 F.3d 1334 (Fed. Cir. 2016).

The court notes that under the plain text of 19 U.S.C. § 1677e(d), added to the statute by the TPEA, Commerce has broad discretion to "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country," and to "apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin."   No party has contended that this language is ambiguous.  In the context of Commerce's execution of its statutory mandates, "reviewing courts must accord deference to the agency in its selection and development of proper methodologies."[26] Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (citing Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).  To the extent that the statutory language poses some ambiguity ripe for interpretation, "[o]ur review centers on whether the agency's interpretations of statutes and regulations it administers are reasonable."  Thai Pineapple, 187 F.3d at 1365 (citing Chevron, 467 U.S. at 844; Daewoo, 6 F.3d at 1516).

---

[26] The parties do not dispute the validity of Commerce's established AFA rate selection hierarchy, Pl.'s Br. at 27–28, Def.'s Br. at 15–16, but only whether Commerce adhered to it in the underlying proceeding.  See Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1373–74 (Fed. Cir. 2014).

Özdemir presents no binding authority to support the proposition that Commerce is bound to a practice of treating programs with ad valorem subsidy rates below 0.005 percent, but not above, as de minimis, for the purpose of selecting AFA rates. Nor does Özdemir offer determinations by Commerce evidencing that practice. See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."), aff'd, 332 F.3d 1370 (Fed. Cir. 2003). Commerce, however, cited to a previous determination explicitly stating, twice, the agency's practice of treating programmatic rates of 0.5 percent or less ad valorem as de minimis. IDM at 7 n.26 (citing Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 75 Fed. Reg. 28,557 (Dep't Commerce May 10, 2010) and accompanying IDM at "1. Grant Under the Tertiary Technological Renovation Grants for Discounts Program," "2. Grant Under the Elimination of Backward Production Capacity Award Fund." ("[A]ll previously calculated rates for grant programs from prior China CVD investigations have been de minimis (e.g., less than 0.5 percent ad valorem).")). Thus Commerce's application of the 0.5 percent threshold was not inconsistent with prior agency practice, and was not arbitrary and capricious, or discordant with law, on those grounds.

The court also finds unavailing Özdemir's subsidiary argument that Commerce did not sufficiently justify the usage of a 0.5 percent de minimis threshold. Commerce did provide a justification of applying that threshold in the same paragraph to which it appended a footnote characterizing the threshold as its normal practice. IDM at 6–7 n.26. Specifically, the purpose of skipping over de minimis rates, and therefore in applying the 0.5 percent de minimis threshold in the contest of AFA rate selection, is "to ensure that the result is sufficiently adverse 'as to effectuate the statutory purposes of the AFA rule to induce respondents to provide [Commerce] with

complete and accurate information in a timely manner.'" IDM at 6 (quoting Notice of Final Determination of Sales at Less than Fair Value: Static Random Access Memory Semiconductors From Taiwan, 63 Fed. Reg. 8909, 8932 (Dep't Commerce Feb. 23, 1998)). Commerce intends that this practice will ensure "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." IDM at 6 (quoting SAA at 870). "Commerce has wide, though not unbounded, discretion 'to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin.'" Papierfabrik, 843 F.3d at 1380 (quoting De Cecco, 216 F.3d at 1032). Indeed, Commerce's methodology here, consistent with the TPEA at 19 U.S.C. § 1677e(d)(1)–(2), has been sustained by the Federal Circuit as permissible, under the previous iteration of the statute. Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1373–74 (Fed. Cir. 2014). Even under the previous iteration of the statute, where AFA rates were to "be a reasonably accurate estimate of the respondent's actual rate," there was too expected "some built-in increase intended as a deterrent to noncompliance." Id. at 1373 (quoting De Cecco, 216 F.3d at 1032). Under that framework, Commerce's decision to disregard Özdemir's desired AFA rate of 0.01 percent ad valorem, derived from the Final OCTG determination, 79 Fed. Reg. 41,964, was reasonable, and in accordance with law.[27]

The court turns to Özdemir's argument that Commerce is invalidly applying a new standard in selecting a "similar" program for AFA purposes, Pl.'s Br. at 31, and finds it unpersuasive. Özdemir contends that Commerce's practice of determining similarity on the basis of relevant subsections of 19 C.F.R. §§ 351.504–20, as represented in SolarWorld Americas, Inc. v. United

---

[27] To the extent that Commerce's application of 0.5 percent as the AFA threshold, or its selection of the highest available rate over that threshold, in the context of the proceedings at issue, also raises a question of factual support, the court finds that these decisions were supported by substantial evidence on the record.

<u>States</u>, 41 CIT ___, ___, 229 F. Supp. 3d 1362, 1368 (2017), conflicts with the agency's similarity determination in this case. Most significantly, <u>SolarWorld</u> does not interpret the relevant statutory provision, 19 U.S.C. § 1677e(d), which was added by the TPEA. Section 1677e(d)(1)(A)(i) permits Commerce to "use a countervailable subsidy rate applied for the same or similar program in a [CVD] proceeding involving the same country." The "similar" qualifier is undefined, and it is within Commerce's purview to effectuate it and give it meaning. The court asks "whether the agency's interpretations of statutes and regulations it administers are reasonable." <u>Thai Pineapple</u>, 187 F.3d at 1365 (citing <u>Chevron</u>, 467 U.S. at 844; <u>Daewoo</u>, 6 F.3d at 1516). From the statute's structure, it is patent that Commerce is entitled to interpret "similar," as the following subsection, (ii), provides that "if there is no same or similar program, [Commerce may] use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use." 19 U.S.C. § 1677e(d)(1)(A). This language indicates a Congressional judgment that Commerce will determine whether a subsidy program is similar, and even if none is found, the agency will have discretion to apply a "reasonable" rate from another program. Özdemir presents no binding precedent that would compel this court to remand Commerce's determination for insufficient explanation of similarity, let alone precedent directing this court to read § 1677(d) less deferentially to Commerce's discretion than the provision's text provides. "[U]nder <u>Chevron</u>, an agency can only reject a prior interpretation of an ambiguous statute if it explains why it is doing so." <u>Mid Continent Nail Corp. v. United States</u>, 846 F.3d 1364, 1382 (Fed. Cir. 2017). Özdemir has presented no prior interpretation by Commerce of the word "similar" in the context § 1677e(d) against which the court could construe the agency's current interpretation.[28]

---

[28] Because the court holds that Commerce's selection of an AFA rate in accordance with the third tier of methodology was reasonable and in accordance with law, the court does not address Özdemir's contention that Commerce impermissibly applied a rate that could not have "conceivably" been used because it was terminated well prior to the underlying proceeding. Pl.'s

Further, SolarWorld does not necessarily stand for the proposition that a subsidy which is or could be classified under a given subsection of § 351 cannot be "similar," for the purposes of AFA rate selection, to a subsidy which is or could be classified under a different subsection of § 351. Indeed, SolarWorld cites Commerce's statement that it "does not look at the 'next most similar program.'" 229 F. Supp. 3d at 1368. Assuming arguendo that SolarWorld does support Özdemir's interpretation, Özdemir has failed to establish that the 1986 Export Tax Rebate program falls under a subsection of § 351 such that it is bereft of similarity to the EFPT program, which falls under § 351.509, for AFA rate selection purposes. See Pl.'s Br. at 19–20. Indeed, at the time of the CWP&T 1986 proceeding, the subsidy identification regulatory regime under 19 C.F.R. §§ 351.504–20 was not in force. In the instant case, Commerce looked to the foreign government's treatment of the benefit in determining whether it is a "similar" program. On the record, it was well within Commerce's discretion to conclude that where the two programs are both tax programs, a sufficient nexus of similarity was established. In sum, Commerce is statutorily authorized to determine, and did reasonably determine, what constitutes similarity for the purposes of AFA rate selection, and Özdemir's argument that Commerce must apply some different standard, without textual or precedential support, is unavailing.

3. Commerce Corroborated the AFA Rate to the Extent Practicable, with the Support of Substantial Evidence and in Accordance with Law.

---

Br. at 31. This argument implicates the fourth tier of Commerce's AFA rate selection methodology, where "[a]bsent an above-de minimis subsidy rate calculated for a similar program, [Commerce] applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies." IDM at 6 (citing 75 Fed. Reg. 28,557; Lightweight Thermal Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 73 Fed. Reg. 57,323 (Dep't Commerce Oct. 2, 2008), and accompanying IDM at "Selection of the Adverse Facts Available Rate.").

Özdemir argues that Commerce failed to corroborate the 14.01 percent rate, which the agency must do "to the extent practicable, . . . from independent sources that are reasonably at [its] disposal," whenever it uses "secondary information other than information obtained in the course of an investigation." Pl.'s Br. at 32 (quoting 19 U.S.C. § 1677e(c)(1)). Özdemir contends that the CWP&T 1986 Export Tax Rebate program is not relevant because it is not similar to the EFPT program based upon treatment of benefit. Pl.'s Br. at 33. Furthermore, to Özdemir, Commerce's application of a terminated program as AFA means "that Commerce did not evaluate probative value (relevance) with a full review of its own files." Pl.'s Reply at 3.

Özdemir additionally argues that "Commerce must select secondary information that has some grounding in commercial reality." Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1324 (Fed. Cir. 2010). Özdemir contends that, though the TPEA removed any statutory requirement "to demonstrate that the countervailable subsidy rate . . . reflects an alleged commercial reality of the interested party," commercial reality remains relevant as it pertains to industry-wide or program-wide considerations. Pl.'s Br. at 32. Özdemir argues that on a program-wide basis, the 14.01 percent rate is far removed from the commercial reality of any alleged EFPT program benefits, which are typically far smaller than that amount. Pl.'s Br. at 33.

To the extent that Özdemir contends that Commerce's verification was not performed in accordance with law, that argument fails. As explained supra, Commerce is empowered to formulate the methodologies it uses to execute its statutory mandates. Thai Pineapple, 187 F.3d at 1365. In this case, as noted, the statute requires that Commerce "shall, to the extent practicable, corroborate [secondary information] from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c)(1). "Corroborate means that the [Commerce] will satisfy [itself]

that the secondary information to be used has probative value." SAA[29] at 870. "The statute does not prescribe any methodology for corroborating secondary information . . . ." Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007), appeal dismissed, 253 F. App'x 19 (2007). Commerce states that it "will, to the extent practicable, examine the reliability and relevance of the information to be used." IDM at 8. Özdemir has proffered no authority demonstrating -- and this court does not conclude -- that on its face Commerce's methodology is unreasonable or not in accordance with law.

To the extent that Özdemir attacks Commerce's findings regarding probative value for lack of substantial evidence support on the record, the court is again unpersuaded. Substantively, corroboration by Commerce requires satisfaction that the secondary information to be used, here the AFA rate from the CWP&T 1986 proceeding, has probative value. SAA at 870. Commerce demonstrates probative value by "demonstrating the rate is both reliable and relevant." Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1354 (Fed. Cir. 2015). Critically, as noted, Commerce is charged with corroborating AFA rates selected from secondary information "to the extent practicable," and with "independent sources reasonably at [its] disposal." 19 U.S.C. § 1677e(c)(1). No more is required. Commerce explained that its corroboration was circumscribed by "the lack of certain record information concerning the programs under investigation," and, generally, the lack of "independent sources for data on company-specific benefits resulting from countervailable subsidy programs." IDM at 8. Commerce, empowered to craft methodology to execute its statutory mandate, thus confronted these limitations by reviewing information concerning Turkish subsidy programs in other cases. Id. Under those circumstances, Commerce determined that the CWP&T 1986 rate was relevant because it was similar, in the sense

---

[29] Regarding the SAA, see supra p. 9 & n.8.

of 19 U.S.C. § 1677e(d)(1)(A)(i), to the EFPT program at issue.  Id.  Commerce's interpretation of the term "similar" is permissible and entitled to deference.  Accordingly, here its analysis of relevance for the purposes of probative value and corroboration, performed "to the extent practicable," is supported by substantial evidence.  Commerce determined that the CWP&T 1986 rate was reliable because it was "calculated in . . . previous Turkey CVD investigations or administrative reviews."  IDM at 8.  Under the limitations articulated by the agency, and under the statutory standard, Commerce's statement regarding reliability served the purposes of corroboration "to the extent practicable."  19 U.S.C. § 1677e(c)(1).  Özdemir has not provided binding authority that would impose on Commerce a corroboration standard stricter than that identified in the statute and the legislative history.  See § 1677e(c)(1); SAA at 869–70.  For these reasons, on the facts before the court, Commerce's corroboration of its selected AFA rate, as well as its explanation of the probative value thereof, IDM at 8, was reasonable, and supported by substantial evidence.

Additionally, Özdemir's commercial reality argument fails because it is contrary to plain statutory language.  Özdemir's case law citations, which interpret a prior version of the statute, do not persuade this court to read the current iteration of the statute contrarily to its unambiguous text.  Commerce "is not required, for the purposes of subsection (c)," which covers corroboration of secondary information, "or for any other purpose . . . to demonstrate that the countervailable subsidy rate . . . [used] reflects an alleged commercial reality of the interested party."  19 U.S.C. § 1677e(d)(3) (emphasis added).  As the current statute disclaims any obligation to consider an interested party's alleged commercial reality "for any . . . purpose," there exists no basis upon which to conclude that such an analysis remains relevant with regard to industry-wide or program-wide considerations, as Özdemir argues.  Pl.'s Br. at 32; see Fresh Garlic Producers Ass'n v. United

<u>States</u>, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1329 (2015) (comparing TPEA § 502(d)(3), 129 Stat. at 384, with <u>Gallant Ocean</u>, 602 F.3d at 1324). Commerce's decision not to rely on an interested party's "alleged commercial reality," § 1677e(d)(3), <u>IDM</u> at 5, when selecting an AFA rate was thus made in accordance with law.[30]

C. <u>Commerce did not Treat Özdemir in an Arbitrary and Capricious Fashion vis-à-vis the Property Tax Exemption.</u>

Özdemir also asserts that Commerce treated it differently from similarly situated respondents so as to constitute arbitrary and capricious behavior. Pl.'s Br. at 33 (citing <u>SKF</u>, 263 F.3d at 1382). Özdemir points to Commerce's 2014 investigation of reinforcing bar from Turkey. Pl.'s Br. at 34 (citing <u>Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination</u>, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014) and accompanying IDM ("<u>Rebar from Turkey</u>")). In that proceeding, Turkish respondent Içdas reported that it had received no benefits under the "lump-sum" program, which allowed respondents to deduct 0.5 percent of their foreign exchange income from taxable income for tax purposes, only for Commerce to discover at verification that Içdas had received this benefit in the POI. <u>Id.</u> Commerce therefore determined that Içdas had failed to cooperate, and applied AFA. <u>Id.</u> However, Commerce explained that "[t]he Deductions for Taxable Income for Export Revenue program is well known

---

[30] To the extent Özdemir argues that Commerce's determination was not supported by substantial evidence because the agency did not address an alleged commercial reality in any respect, the court disagrees, and holds that Commerce's determination was supported by substantial evidence. The operative point is that under the statute, Commerce need not analyze, or make any findings regarding, an alleged commercial reality. 19 U.S.C. § 1677e(d)(3)(B). As no record support, let alone the support of substantial evidence on the record, is required to buttress Commerce's determination, any argument based on lack of record support on that basis must fail. Özdemir has offered no precedent or binding authority holding otherwise.

to the Department, having examined, verified, and countervailed it in numerous Turkey CVD cases." Id. Commerce calculated an AFA benefit of 0.10 percent. Id. Özdemir argues that here, as in Rebar from Turkey, Commerce is familiar with the program at issue, having countervailed the EFPT program on numerous occasions, and that the record contains all information required to calculate the amount of the benefit. Pl.'s Br. at 34. Per Özdemir, the difference here is that Özdemir reported the non-use of the program, and Commerce verified that non-use, while in Rebar from Turkey, Commerce discovered the respondent's affirmative use of the program at issue during verification. Id. at 35. Altogether, Özdemir argues that "while Commerce filled the gap in the record for Içdas based upon the maximum possible benefit and record information about Içdas, Commerce here disregarded its institutional knowledge and record evidence, and instead sought the highest rate it could find to impose on Özdemir." Id.

The court does not find this argument persuasive. While Rebar from Turkey involved a Turkish respondent and a subsidy program that was "well known to [Commerce]," insofar as it had been countervailed numerous times beforehand, Özdemir fails to establish that Commerce's treatment of respondent Içdas constitutes a practice to which the agency must now be bound. That the operative statutory provisions, to wit, § 1677e(b), (c), were modified, and, in the case of (d), added, further defeats the contention that the two situations are sufficiently similar so as to bind Commerce's behavior in the latter investigation to that in the former. SKF, 263 F.3d at 1382. Even if Rebar from Turkey could be considered a "similar situation" to the underlying proceeding for the purposes of an arbitrariness analysis, the record does express "[]sufficient reasons" for Commerce's AFA selection and application to Özdemir. SKF, 263 F.3d at 1382. As described supra, under the new statutory standard imposed by the TPEA amendments, Commerce's AFA

selection methodology, and ultimate selection, were supported by substantial evidence and made in accordance with law.

## II.     Commerce's Benchmark Calculation was Not Supported by Substantial Evidence and in Accordance with Law.

As noted, also before the court is Özdemir's contention that Commerce's inclusion of two particular land parcels -- namely, those located in Istanbul and Yalova Altinova ("Yalova") -- in the Land for LTAR benchmark, is unsupported by record evidence and contrary to law. Citing 19 U.S.C. § 1677 and 19 C.F.R. § 351.511, the Government argues that Commerce's usage of its "preferred benchmark: publicly available, market-determined prices from industrial land sales between private parties in Turkey," was supported by substantial evidence. Def.'s Br. at 21–22 (citing IDM at 15).

As set forth, supra pp.3–4, to determine whether a foreign government provided a subsidy, Commerce must determine whether a government authority provides a specific financial contribution to a person and a benefit is conferred. 19 U.S.C. § 1677(5)(B). In determining whether a benefit is conferred, the statute provides that "a benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . if such goods or services are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). The adequacy of remuneration is determined in relation to prevailing market conditions in the country that is subject to the investigation. "Prevailing market conditions include price, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

Consistent with the statute, Commerce's regulations set forth the basis for identifying appropriate market-determined benchmarks for measuring the adequacy of remuneration for government-provided goods. 19 C.F.R. § 351.511. Where feasible, Commerce should "compar[e] the government price to a market-determined price for the good . . . resulting from actual

transactions in the country in question." Id. § 351.511(a)(2)(i). When market-determined prices are unavailable or unusable, Commerce will resort to comparison to a world market price; if a world market price is also unavailable, Commerce may assess "whether the government price is consistent with market principles." Id. § 351.511(a)(2)(ii)–(iii).

When Commerce uses an actual transaction price or a world market price, it will "adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported that product," including "delivery charges and import duties." 19 C.F.R. § 351.511(a)(2)(iv). "[T]his practice ensures that the Department engages in a fair comparison between the government price and the price that a company 'would pay if it imported the product.'" United States Steel Corp. v. United States, 33 CIT 1935, 1946 (2009) (quoting 19 C.F.R. § 351.511(a)(2)(iv)).

As noted, to calculate the land benchmark in the investigation here, Commerce used its preferred benchmark: publicly available, market-determined prices from industrial land sales between private parties in Turkey. IDM at 15. Specifically, Commerce used land parcels under the category "Investment Land for Industrial Facilities," a designation that corresponds to land suitable for production of subject merchandise. Id. at 28. To derive an average price from all the parcels, Commerce stated that it moderated any differences in the infrastructure levels of the land parcels, and claims that it satisfied the comparability requirements of 19 C.F.R. § 351.511.

Özdemir argues that Commerce's decision to include allegedly anomalous prices with the benchmark for land valuation is unsupported by record evidence and not in accordance with law. Pl.'s Br. at 35. "When confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007). Here, Commerce included a total

of fourteen advertisements for sale of land parcels in Turkey in 2009 and 2010 (listed in descending

price order in the table, below), and used the simple average of 89.62 TL/m2 as the benchmark:

| Benchmark Land Price Data | |
|---|---|
| | Price (TL/m2) Indexed to 2008 |
| **Istanbul** | **512.17** |
| **Yalova Altinova** | **304.90** |
| Gaziantep | 67.09 |
| Gaziantep | 66.67 |
| Gaziantep | 59.09 |
| Kirklarei | 51.22 |
| Kirklarei | 42.35 |
| Kirklarei | 36.58 |
| Kirklarei | 36.58 |
| Ankara | 26.01 |
| Tekirdag Corlu | 23.47 |
| Tekirdag Corlu | 14.42 |
| Tekirdag Corlu | 11.29 |
| Gaziantep | 2.87 |
| **Simple Average TL/m2 Price** | **89.62** |

Özdemir argues that Commerce should not include parcels of land located in highly

developed provinces, such as Yalova and Istanbul, because these properties are highly priced and

anomalous vis-à-vis prices in areas outside of Istanbul and Yalova. Pl.'s Br. at 41.

Özdemir further argues that Commerce's analysis of the types of properties being

compared is based entirely upon petitioners' speculative statements. Pl.'s Br. at 42. Specifically,

Özdemir contends that "Commerce's analysis is not based upon record evidence, however, but

rather on petitioner's unsupported speculation about land values in Turkey." Id. Özdemir takes

issue with Commerce's reliance on petitioners' arguments:

> We agree with the petitioners that the mere fact that past or current
> usage of the Istanbul and Yalova parcels was 'agricultural' does not
> undermine comparability for benchmarking purposes. What
> matters, as the petitioners correctly implied, is the usage for which
> these parcels were being offered on the market for future use.
> Specifically, these parcels were being offered for industrial

> development and, for that purpose, were classified as 'investment land for industrial facilities.' This puts them in essentially the same category in the land market as the other parcels in the benchmark, and in deriving an average price from all the parcels, we thereby moderate any differences in, e.g., the levels of infrastructure development, maintaining a reasonable level of comparability that satisfies the requirements of 19 C.F.R. § 351.511.

Pl.'s Br. at 38–39 (quoting IDM at 28).

The court is persuaded by Özdemir's arguments that, based on the facts in the record, Commerce's creation of the land benchmark is deficient. Commerce must consider relevant record evidence in determining the comparability of land parcels it uses in creating a reasonable benchmark that lacks distortive pricing. See 19 C.F.R. § 351.511(a)(2)(i) ("In choosing such transactions or sales, [Commerce] will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.").

The land price data for Istanbul (512.17) and Yalova (304.90) deviate substantially from the land price data associated with the other parcels. As Özdemir points out, the Istanbul and Yalova property values are 571 percent and 340 percent, respectively, of the average of all fourteen parcels; they are 763 percent and 454 percent, respectively, of the next-highest-priced parcel (67.06 TL/m2); and, when the highest two and lowest three parcel prices are removed, the Istanbul and Yalova parcels are 1127 percent and 671 percent of the 45.45 TL/m2 average of the remaining nine parcels. The court is satisfied that Özdemir's argument thus constitutes at least a "colorable claim that the data that Commerce is considering is aberrational." Mittal Steel Galati S.A., 502 F. Supp. 2d at 1308. Regarding the "publicly available information concerning industrial land prices in Turkey [used] for purposes of calculating a comparable commercial benchmark price for land available in Turkey," Commerce summarily states that it found that the selected land prices, including those of the Yalova and Istanbul parcels,

"serve as comparable commercial benchmarks under 19 CFR 351.511(a)(2)(i)."  IDM at 15. Commerce also states that it effectively moderates any differences in the land parcels by "deriving an average price from all the parcels."  IDM at 28.  These concise statements do not constitute a reasoned explanation as to why the data Commerce chose is reliable and non-distortive, given the disparities noted supra, and in light of a colorable claim that the data are aberrational.  See Mittal Steel, 502 F. Supp. 2d at 1308.  Nor does Commerce explain how precisely a simple average of prices offsets the potentially distortive data which contributes to the derived average.

The court turns to Özdemir's arguments regarding the property location and level of development underlying the Yalova and Istanbul parcels.  "As Commerce's own benchmarking method indicates, using 'comparables' of proximate parcels (e.g., in location, terrain, size, features) is an accepted proposition for purposes of land and realty valuation."  Toscelik Profil Ve Sac Endustrisi A.S. v. United States, 38 CIT ___, Slip Op. 14-126 at 14 n.14 (Oct. 29. 2014) (Not Reported in F. Supp. 3d).   It may be that land located in highly developed areas is worth several times more than land in lesser developed areas in Turkey.  See table supra.  In light of the presence of a colorable claim that the relevant price data is aberrational, Commerce's summary statements in the IDM do not carry the support of substantial evidence in the resolution of the question.  See IDM at 27.  On remand, Commerce should consider, pursuant 19 C.F.R. § 351.511(a)(2), the relevance of the locations, and the level of land development, of the Yalova and Istanbul parcels.

The court finally addresses Özdemir's argument that Commerce unduly emphasizes future use of the relevant properties, at the expense of their current and past uses.  A reasonable person interested in participating in a real estate transaction could believe that actual current or past use are equally important as future use to consider in assessing the price of land offered in online

advertisements.  Conf. Joint App. Memo. To File, P.R. 200.  Despite agreeing with petitioners' implication, Commerce does not explain in the IDM why potential future use factors more prominently in its analysis under 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(2) than past or current uses.  IDM at 28.  Commerce must explain its focus on a land parcel's future use, at least as advertised in regard to the relevant parcel.  See Changzhou Wujin, 701 F.3d at 1377 ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (quoting SEC v. Chenery Corp., 318 U.S. 80, 87)).

The court does not take issue with the Government's characterization that benchmark data "need not – and rarely does – perfectly match the benefit it is used to measure."  Def. Br. at 23.  However, as to each of the factual matters highlighted by Özdemir, and based on the record before the court, Commerce has failed, in constructing and applying its land benchmark, to articulate a rational connection between the facts it found and the choices it made.  See Motor Vehicle Mfr. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines Inc. v. United States, 371 U.S. 156, 168 (1962)).  "[I]t is the agency's responsibility, not this Court's, to explain its decision," and Commerce must do so based on the record before it. Id. at 57.  Commerce's determination therefore lacks the support of substantial evidence on the record.  Maverick Tube, 857 F.3d at 1359.

The court thus remands this case for reconsideration and further explanation consistent with the court's opinion.  If Commerce chooses to maintain its current position on remand, it must explain why, specifically, the prices associated with the land sale data for the Yalova and Istanbul provinces are not aberrational, and how its average price derivation successfully moderates the land parcel price disparities.  Commerce should consider the record as a whole in reaching its conclusions regarding the comparability of those land parcels.  See CS Wind, 832 F.3d at 1373

("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); 19 C.F.R. § 351.511. Commerce must also explain whether the Yalova and Istanbul parcels are located in a highly developed area of Turkey, as compared to other parts of Turkey, and how Commerce's findings with respect to that issue affect its overall analysis; and why future usage of the relevant land parcels, as purported in online advertisements, is "what matters" under 19 U.S.C. § 1677(E)(iv) and 19 C.F.R. § 351.511. IDM at 28.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Özdemir's motion for judgment on the agency record is denied in part; and it is further

**ORDERED** that Commerce's determination regarding the Land for LTAR issue is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's Final Determination is sustained in all other respects; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

/s/  *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: October 16, 2017
         New York, New York