# United States Court of Appeals for the Federal Circuit

---

**MAVERICK TUBE CORPORATION, UNITED STATES STEEL CORPORATION,**
*Plaintiffs-Cross-Appellants*

**BOOMERANG TUBE LLC, ENERGEX TUBE, TMK IPSCO, TEJAS TUBULAR PRODUCTS, VALLOUREC STAR, L.P., WELDED TUBE USA INC.,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**v.**

**CAYIROVA BORU SANAYI VE TICARET A.S., TOSCELIK PROFIL VE SAC ENDUSTRISI A.S.,**
*Defendants-Appellees*

**BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., BORUSAN ISTIKBAL TICARET,**
*Defendants-Appellants*

---

2016-1649, 2016-1656, 2016-1689

---

Appeals from the United States Court of International Trade in Nos. 1:14-cv-00214-RKM, 1:14-cv-00229-RKM,

1:14-cv-00233-RKM, 1:14-cv-00240-RKM, Senior Judge R. Kenton Musgrave.

————————————

Decided:  May 30, 2017

————————————

ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for plaintiff-cross-appellant Maverick Tube Corporation. Also represented by ALAN H. PRICE, STEPHANIE MANAKER BELL, TESSA V. CAPELOTO, LAURA EL-SABAAWI, JEFFREY OWEN FRANK, DERICK HOLT, USHA NEELAKANTAN, ADAM MILAN TESLIK.

KELSEY RULE, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, argued for plaintiff-cross-appellant United States Steel Corporation. Also represented by DEBBIE LEILANI SHON, JONATHAN GORDON COOPER, JON DAVID COREY, PHILIP CHARLES STERNHELL.

HARDEEP KAUR JOSAN, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, CLAUDIA BURKE, Washington, DC; SCOTT DANIEL MCBRIDE, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

MARK B. LEHNARDT, Antidumping Defense Group, LLC, Washington, DC, argued for defendants-appellees Cayirova Boru Sanayi Ve Ticaret A.S., Toscelik Profil Ve Sac Endustrisi A.S. Also represented by DAVID L. SIMON, Law Offices of David L. Simon, Washington, DC.

JULIE MENDOZA, Morris, Manning & Martin, LLP, Washington, DC, argued for defendants-appellants Borusan Mannesmann Boru Sanayi Ve Ticaret A.S., Bo-

rusan Istikbal Ticaret. Also represented by DONALD CAMERON, JR., MARY HODGINS, BRADY MILLS, R. WILL PLANERT, SARAH SUZANNE SPRINKLE.

---

Before PROST, *Chief Judge,* LOURIE and TARANTO, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. and Borusan Istikbal Ticaret (together, "Borusan") appeal from the final judgment of the Court of International Trade ("the Trade Court") sustaining the determination of the U.S. Department of Commerce ("Commerce") on remand to apply adverse facts available ("AFA") after Borusan did not report input purchases for two of its steel mills. *See Maverick Tube Corp. v. United States*, No. 14-00229, 2016 WL 703575 (Ct. Int'l Trade Feb. 22, 2016) ("*Borusan II*"); Final Results of Remand Determination, *Maverick Tube Corp. v. United States*, No. 14-00229, ECF No. 92, slip op. at 19–28 (Ct. Int'l Trade Aug. 31, 2015) ("*Remand Results*"). Maverick Tube Corporation and U.S. Steel (together, "Maverick") cross-appeal, arguing that the Trade Court should not have vacated Commerce's original finding that the Turkish market for hot-rolled steel ("HRS") was distorted by government involvement. *See Borusan Mannesmann Boru Sanai Ve Ticaret v. United States*, 61 F. Supp. 3d 1306, 1327–31 (Ct. Int'l Trade 2015) ("*Borusan I*"); *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't of Commerce July 18, 2014) ("*Original Results*"). In the alternative, Maverick challenges the Trade Court's sustaining of Commerce's refusal to apply AFA to the government of Turkey ("GOT") for failing to provide data on the Turkish market for HRS or to adequately explain its lack of data. *See Borusan II*, 2016 WL 703575, at *2–3. For the reasons that follow, we *affirm*.

BACKGROUND

On July 2, 2013, certain domestic producers of oil country tubular goods ("OCTG") filed a petition with Commerce alleging that GOT was providing countervailable subsidies to domestic exporters. *Borusan I*, 61 F. Supp. 3d. at 1310–11. Commerce subsequently instituted a countervailing duty investigation. *Certain Oil Country Tubular Goods from India and Turkey*, 78 Fed. Reg. 45,502 (Dep't of Commerce July 29, 2013). Although myriad arguments were presented to Commerce and the Trade Court prior to the present appeal, we recount only those facts relevant to the appealed issues.

After institution, Commerce selected Borusan and GOT as mandatory respondents. Because HRS is an input used in the manufacture of OCTG, Commerce then issued each a questionnaire relating to the provision of HRS in Turkey. As Borusan and GOT's responses implicate different issues, we provide further factual and procedural background relating to each in turn.

A.   Borusan

In its initial questionnaire, Commerce asked Borusan to report its purchases of HRS during the period of investigation ("POI"), "regardless of whether [Borusan] used the [HRS] to produce [OCTG]" during that period. Joint Appendix ("J.A.") 1645. Borusan responded that it had three production facilities during the POI: Gemlik, Halkali, and Izmit. J.A. 1645. During the POI, Borusan averred that (1) only Gemlik produced subject OCTG; and (2) no HRS purchased for the other facilities was transferred to Gemlik. J.A. 1645. Borusan only provided data for the Gemlik location because only that location "could have benefitted from subsidies attributable to the production or sale of the OCTG subject merchandise." J.A. 1645.

Borusan noted that it had difficulties compiling that information. Specifically, Borusan contended that (1) the

process of gathering the requested data was "extremely time consuming and burdensome," resulting in "well over 300 printed pages"; and (2) gathering the requested data required Borusan to "extract the data from two different data systems." J.A. 1645 & n.2. Accordingly, Borusan argued that requiring data for the other two locations "would impose great burdens on [Borusan] for no purpose." J.A. 1645.

Commerce saw the matter differently. In a supplemental questionnaire, Commerce noted that Borusan "did not . . . report HRS purchases for [Borusan]'s two other mills," despite the original questionnaire asking for that information. J.A. 4393. Thus, Commerce asked Borusan to "please report all of [Borusan]'s purchases of HRS, including its purchases for the Halkali and Izmit mills." J.A. 4393. Commerce did indicate, however, that if Borusan was "unable to provide this information," it should "explain in detail why [Borusan could] not provide this information and the efforts [Borusan] made to provide it to [Commerce]." J.A. 4393.

In response, Borusan did not provide data for the Halkali and Izmit locations. Instead, Borusan further detailed its difficulties in compiling data for the Gemlik location. Borusan reiterated its statements from its initial response, explained that it had to separate expenses manually, and that the process for Gemlik alone "took over two weeks of preparation by numerous members of [Borusan]'s staff." J.A. 5975–76. Thus, Borusan asked Commerce to "take into consideration the significant burdens associated with gathering" information relating to the Halkali and Izmit mills. J.A. 5976.

Borusan then attempted to invoke 19 U.S.C. § 1677m(c)(1) and (2), J.A. 5976–77, which provide that if an interested party notifies Commerce promptly after receiving a request that it is "unable to submit the information requested in the requested form and manner,

together with a full explanation and suggested alternative forms," then Commerce "shall consider the ability of the interested party" and "may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party." Borusan explained that it had informed Commerce of the burdens associated with producing the requested information, and expanded on those burdens in response to the supplemental questionnaire. J.A. 5977. Borusan indicated that it believed that the Gemlik data was sufficient because, in its view, the Gemlik data allowed Commerce to capture "any possible benefit from [Borusan]'s . . . purchases that may have benefitted the production or sale" of the subject OCTG. J.A. 5977–78. Nevertheless, Borusan indicated "its intention []to fully cooperate" with Commerce's investigation and "to respond to all reasonable requests for information." J.A. 5978. If Commerce "insist[ed] on full reporting of all hot-coil purchases from every facility" then Borusan indicated that it was "ready to provide that information with the understanding that it will require several weeks to do so." J.A. 5978.

Commerce did not respond directly to Borusan's response to the supplemental questionnaire. Instead, in its preliminary determination, and again in its post-preliminary calculation memo and final determination, Commerce determined that it was appropriate to apply AFA to Borusan because Borusan did not provide data relating to the Halkali and Izmit locations. *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41,964, 79 ITADOC 41,964, Issues & Decision Memorandum, at 9–12 (Dep't of Commerce July 18, 2014) ("*Original Results Memo*"). Commerce noted that it had twice requested data relating to all purchases of HRS and that Borusan did not provide those data or provide evidence that they were unavailable. *Id.* at 10–11. Thus, Commerce determined that Borusan "failed to cooperate by not acting to the best of its ability because Borusan

withheld requested information on its purchases of HRS, despite having two opportunities, and never requested an extension." *Id.* at 12. Borusan appealed the application of AFA to the Trade Court, which remanded to Commerce for further justification of why it needed data for the Halkali and Izmit locations. *Borusan I*, 61 F. Supp. 3d at 1348–49.

On remand, Commerce determined that data on the Halkali and Izmit locations were necessary, and again determined that it was appropriate to apply AFA given that Borusan did not provide such data. *See Borusan II*, 2016 WL 703575, at *3–8 (discussing Commerce's determination on remand). Borusan appealed again, and the Trade Court determined that Commerce's application of AFA was supported by substantial evidence because "Commerce's request for that information was still outstanding by the time Commerce reached its preliminary determination." *Id.* at *8. Accordingly, the Trade Court determined that "substantial evidence supports that Borusan at least shared if not bore responsibility for the state of the record, and the state of the law does not, apparently, require more of Commerce." *Id.*

### B. GOT

Commerce's questionnaire to GOT focused more on the general state of the Turkish HRS industry. Specifically, Commerce asked GOT to provide "[t]he total volume and value of Turkish domestic consumption of [HRS] and the total volume and value of Turkish domestic production of [HRS]," as well as data relating to the "percentage of domestic consumption accounted for by domestic production," the "total volume and value of imports of [HRS]," and other data relevant to determining whether companies owned or effectively owned by GOT constituted a significant share of the market. J.A. 4401–04. GOT responded that data relating to HRS were not available, and so provided figures relating to "flat steel products."

J.A. 4401.  GOT indicated that the flat steel data included "hot-rolled coils, cold-rolled coils, stainless coils, etc." and referred to those numbers to answer Commerce's questions.  *See* J.A. 4401–03.  In responding to another question, however, GOT stated that "the Erdemir Group . . . produces [a] majority of HRS in Turkey."  J.A. 4404.

In its response, GOT also referenced a number of documents that appeared to describe government aid to the steel industry.  *See* J.A. 16724–25.  Accordingly, Commerce asked to review those documents.  J.A. 16724.  GOT responded that the documents were produced as a result of bilateral trade agreements between Turkey and the European Union ("EU"), and the process was conducted "on condition of confidentiality."  J.A. 16724.  Moreover, GOT claimed that the documents requested by Commerce included proprietary information of companies not subject to the investigation, and that GOT therefore was not able to share those documents.  J.A. 16724.

In its final determination, Commerce found that GOT exercised meaningful control over Erdemir Group and its subsidiary Isdemir (together, "Erdemir"), and therefore that it was appropriate to treat them as government bodies.  *Original Results Memo*, 79 Fed. Reg. 41,964, 79 ITADOC 41,964, at 21–22.  Borusan's data indicated that it had purchased HRS from Erdemir; accordingly, Commerce turned to analyzing whether Borusan had received a benefit in making those purchases by comparing the price Borusan paid to other prices.  *Id.* at 22–23.

Commerce generally prefers to compare prices paid to actual transactions in the country in question.  *See* 19 C.F.R. § 351.511(a)(2)(i).  If the market in that country is distorted by government involvement, however, then Commerce will consider the prices paid in that country as not an appropriate basis of comparison, *Preamble*; *Countervailing Duties*; *Final Rule*, 63 Fed. Reg. 65348, 65377 (Dep't of Commerce Nov. 25, 1998) (the "*Preamble*"), and

will instead look to world market prices, 19 C.F.R. § 351.511(a)(2)(i).

Commerce began here by determining whether the Turkish HRS market was distorted. Commerce noted that GOT averred that HRS production and consumption data were unavailable for the POI, and that the flat steel data included many non-HRS products. *Original Results Memo*, 79 Fed. Reg. 41,964, 79 ITADOC 41,964, at 23. Commerce relied upon import statistics for hot-rolled coil and proprietary business information, however, to find that domestic Turkish production of HRS "accounted for a majority of the total supply (inclusive of imports) in Turkey during the POI and previous two years." *Id.* Commerce also noted that GOT had admitted that Erdemir "accounts for the majority of HRS production in Turkey." *Id.* at 24. Because domestic production accounted for a majority of total supply and Erdemir accounted for a majority of domestic production, Commerce found that Erdemir accounted for, at a minimum, a substantial portion of the domestic market, and so "the level of government involvement in the market was such that prices would be significantly distorted." *Id.*

In reaching that conclusion, Commerce cited the *Preamble*, which states that Commerce recognizes that while "government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market." *Preamble*, 63 Fed. Reg. at 65377. Accordingly, Commerce determined that prices paid in Turkey could not be independent of the government price, and used world prices to determine that Borusan had received "a countervailable subsidy of 15.58 percent." *Original Results Memo*, 79 Fed. Reg. 41,964, 79 ITADOC 41,964, at 24–26.

Along with the application of AFA, Borusan appealed to the Trade Court Commerce's finding that the Turkish market was distorted. The Trade Court vacated Commerce's finding of distortion and remanded for further explanation. *Borusan I*, 61 F. Supp. 3d. at 1327–31. The Trade Court explained that Commerce's finding required further explanation because (1) the *Preamble* indicates that "distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market"; (2) Commerce had concluded that Erdemir only controlled a substantial portion of the market; and (3) Commerce had not cited any actual evidence of market distortion or explained the "certain circumstances" giving rise to its finding. *Id.* at 1328–31 (citing *Preamble*, 63 Fed. Reg. at 65,377). The case was consolidated for remand with another case involving Toscelik Profil ve Sac Endustrisi A.S. and Cayirova Boru Sanayi ve Ticaret A.S. (together, "Toscelik"), other Turkish companies subject to similar claims by domestic industry litigants. *Borusan II*, 2016 WL 703575, at *2.

On remand, Commerce agreed that the language in the *Preamble* "does suggest a possible limitation on Commerce's analysis to 'certain circumstances' when 'a substantial portion of the market' is at issue," but "does not suggest the same constraint when the government 'constitutes a majority of the market.'" *See Remand Results*, slip op. at 13. In the present case, however, Commerce averred that the data "suggest the possibility that the government provider in this case might, in fact, have constituted a majority of the market." *Id.* Commerce noted that "the record evidence on this point is incomplete because GOT did not respond fully and comprehensively to Commerce's requests for information," *id.* at 13–14, and argued that it never found that Erdemir accounted for less than a majority of the Turkish HRS market; instead, it was "Commerce's cautious conclusion based on the

limited data on the record," *id.* at 14. Thus, Commerce indicated that it was conducting its distortion analysis on remand under protest for two reasons. First, because the situation was "different from one in which the record information shows definitely that government providers account for less than the majority of the market for a good." *Id.* at 14. Second, Commerce did not have relevant information because GOT did not provide it. *Id.* at 15.

Even though Commerce noted that the GOT was being "rewarded for not providing relevant information," *id.* at 15, Commerce refused to apply AFA to GOT, *id.* at 29–32. Commerce noted that GOT stated that documents containing other relevant information could not be shared because of confidentiality agreements. *Id.* at 30. As to the HRS production information, Commerce expressed that although "it seems highly unlikely that the GOT would be unable to gather information on domestic steel production in Turkey, there is no evidence on the record which would contradict the GOT's claim." *Id.* at 30–31. Commerce also concluded that reassessing GOT's failure to provide data was outside of the scope of the remand order from the Trade Court. *Id.*

When it performed its analysis, Commerce determined that there was insufficient evidence to support a finding that Erdemir accounted for a majority of the HRS market. *Id.* at 15–16. Commerce also determined that there was no evidence of the type of government controls that had led it to a conclusion of market distortion in past cases. *Id.* at 16–17. As it found that there was no evidence of market distortion in the record, Commerce then recalculated Borusan's countervailable subsidy using Turkish transactions to be 2.08 percent. *Id.* at 18.

The Trade Court affirmed. *Borusan II*, 2016 WL 703575, at *2–3. It reasoned that, notwithstanding Commerce's protests, neither Commerce nor Maverick could identify any dispositive evidence of market distor-

tion, and nothing indicated that GOT was not being truthful regarding its access to data or the confidentiality requirements. *Id.* at \*3. Given the evidence in the record, the Trade Court concluded that substantial evidence supported Commerce's finding of no distortion and its decision not to apply AFA to GOT. *Id.*

Borusan timely appealed and Maverick timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

In appeals from the Trade Court, we apply the same standard of review that it applies, upholding Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding. *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Although we review the decisions of the Trade Court *de novo*, "we give great weight to the informed opinion of the [Trade Court] . . . , and it is nearly always the starting point of our analysis." *Ningbo Dafa Chem. Fiber Co. v. United States,* 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks, brackets, and citations omitted).

## A.  Borusan's Appeal

Borusan argues that Commerce's decision to apply AFA is unsupported by substantial evidence and contrary to law because Commerce must consider difficulties encountered by an interested party in responding to requests and modify requirements to avoid imposing an unreasonable burden. *See* Borusan's Br. 19 (citing 19 U.S.C. § 1677m(c)(1)). Borusan contends that it cooperated with Commerce's requests to the best of its ability because Commerce never unconditionally instructed

Borusan to supply the information from the Halkali and Izmit locations; instead, Commerce's supplemental questionnaire asked Borusan to provide the information or else explain why it could not do so. Because Borusan provided more detail explaining why production of the information relating to the Halkali and Izmit locations was unduly burdensome, Borusan argues, it directly responded to Commerce's requests and thus cooperated to the best of its ability. Finally, Borusan contends that if Commerce determined that its supplemental response was insufficient, it was required to give Borusan "an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d).

Maverick and the United States respond that Commerce's application of AFA is supported by substantial evidence. They contend that by failing to provide the data for the Halkali and Izmit locations in its first response, and again failing to provide those data in response to the supplemental questionnaire, Borusan did not cooperate to the best of its ability. Moreover, Maverick and the United States contend that Borusan never triggered 19 U.S.C. § 1677m(c)(1) or gave a proper response to Commerce's supplemental questionnaire because it never indicated that it was unable to provide the requested information. They contend that Borusan was on notice that its initial response was deficient because Commerce issued the supplemental questionnaire seeking the same information.

We agree with Maverick and the United States that substantial evidence supports Commerce's decision to apply AFA. Commerce requested information from Borusan, which Borusan did not provide and never claimed that it was unable to provide.

"If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce],

[then Commerce] . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b) ); *see Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337–38 (Fed. Cir. 2016) (discussing burdens of proof in administrative proceedings before Commerce). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum efforts to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

"Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012). Thus, "[t]he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

Borusan does not dispute that it had access to information relating to the Halkali and Izmit locations, and that it did not provide that information. Moreover, although Borusan challenged before the Trade Court whether that information was necessary for Commerce's determination, it does not raise that challenge before us. Accordingly, Borusan has waived any argument that the information from the Halkali and Izmit locations was unnecessary for Commerce's investigation. *See Lifestyle Enter., Inc. v. United States*, 751 F.3d 1371, 1377 (Fed. Cir. 2014).

Thus, Borusan effectively concedes that it possessed information necessary to Commerce's investigation, that Commerce requested that information, and that Borusan did not provide that information. Such behavior cannot be considered "maximum effort to provide Commerce with

full and complete answers." *Nippon Steel Corp.*, 337 F.3d at 1382.

Borusan's arguments do not convince us otherwise. First, although Commerce's supplemental request required it only to provide the information or explain why it was unable to do so, Borusan did neither. Borusan admits it did not provide the information, and the explanation of its difficulties does not constitute a statement that it was unable to provide the information.

Borusan's invocation of § 1677m(c) in its supplemental response also does not change the outcome. By its own terms, § 1677m(c)(1) only applies where a party notifies Commerce "that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms . . . ." Borusan never indicated that it was unable to provide the relevant information. Indeed, Borusan admitted that it *could* provide that information. Borusan also never suggested an alternative for the requested information; instead, its "alternative" was not providing the information at all.

Finally, we are not convinced by Borusan's argument relating to § 1677m(d). Borusan had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified Borusan of that defect. § 1677m(d) does not require more. *See NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) ("Commerce . . . satisfied its obligations under section 1677m(d) when it issued a supplemental questionnaire specifically pointing out and requesting clarification of [the] deficient responses.").

Accordingly, Commerce's application of AFA to Borusan is supported by substantial evidence and in accordance with law.

### B.  Maverick's Cross-Appeal

Maverick's cross-appeal raises two issues.  First, it argues that the Trade Court should not have vacated Commerce's original determination that the Turkish market for HRS was distorted.  Second, it argues in the alternative that Commerce's decision not to apply AFA to GOT is not supported by substantial evidence.  We take each issue in turn.

Maverick argues that Commerce's original determination was supported by substantial evidence because there was evidence that (1) Erdemir produced the majority of domestic HRS; (2) domestic production of HRS constituted a majority of the total supply; and (3) the share of domestic production of HRS was greater than the shares calculated for the flat-steel data provided by GOT.  Because the evidence establishes that Erdemir controls at least a substantial portion, and possibly a majority, of the market, Maverick contends, this case is different from those where the government certainly controlled less than a majority.  Although the Trade Court faulted Commerce for not explaining the "certain circumstances" leading to a finding of distortion, Maverick argues that the Trade Court ignored the role that GOT played in creating the deficient record.

Borusan and Toscelik respond that Commerce's original determination of distortion was not supported by substantial evidence.  They aver that there was no evidence that Erdemir controlled a majority of the Turkish market for HRS, and that even if Erdemir controlled a substantial portion of the market there was no evidence of circumstances which would suggest distortion.  Instead, they contend, Commerce applied a *per se* rule that is inconsistent with the *Preamble*.

We agree with Borusan and Toscelik that Commerce did not adequately support its original finding of market distortion.  Under the *Preamble*, which all parties treat as

binding, government involvement "will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market." 63 Fed. Reg. at 65377. Commerce's analysis did not purport to find that Erdemir constituted a majority of the market and instead only found that Erdemir was the majority domestic producer and domestic production accounted for a majority of the Turkish market, and so "at a minimum, Erdemir . . . account[ed] for 'a substantial portion of the market.'" *Original Results Memo*, 79 Fed. Reg. 41,964, 79 ITADOC 41,964, at 24 n.181 (quoting *Preamble*, 63 Fed. Reg. at 65377). From there, Commerce jumped to the finding that the market was distorted, without addressing or finding any circumstances which would actually suggest distortion. *See id.* at 24. Although it does appear *possible* that GOT controlled a majority of the market, neither Commerce nor Maverick cite any record evidence establishing that fact, and they also do not cite any record evidence of any indicia of distortion. We thus agree with Borusan, Toscelik, and the Trade Court that Commerce applied what amounted to a *per se* rule of market distortion after finding GOT controlled a substantial portion of the market, despite the *Preamble*'s language to the contrary. Therefore, Commerce's original finding was not supported by substantial evidence.

Maverick next argues that Commerce erred on remand by not applying AFA to GOT. Maverick contends that because GOT failed to cooperate fully with Commerce's investigation by not providing data for HRS production and not supplying requested documents, it did not act to the best of its ability. Maverick argues that not applying AFA frustrates the purpose of the statute by allowing GOT to benefit from its lack of responsiveness.

Borusan and Toscelik respond that Commerce's determination not to apply AFA to GOT is discretionary, not mandatory, and is supported by substantial evidence.

They contend that Commerce never found that GOT failed to respond to the best of its ability or withheld information, and in fact noted that GOT had provided timely responses to all of its questionnaires. Moreover, they assert that Commerce correctly determined that there was no evidence contradicting GOT's claim that it did not possess production data for HRS or that requested documents could not be disclosed due to confidentiality agreements.

We agree with Borusan and Toscelik that Commerce's decision not to apply AFA is supported by substantial evidence. Maverick's argument that GOT withheld relevant information assumes that GOT had access to that information; as Commerce noted, however, there was no evidence that GOT had access to or maintained the HRS data that it claimed that it was unable to provide. *Remand Results*, slip op. at 30–31. Moreover, nothing contradicted GOT's claim that the documents sought by Commerce could not be shared due to confidentiality agreements. *See id.* at 30.

## CONCLUSION

We have considered the remaining arguments, but find them unpersuasive. For the foregoing reasons, the decision of the Trade Court is affirmed.

**AFFIRMED**

## COSTS

No costs.