# United States Court of Appeals for the Federal Circuit

---

**HYUNDAI ELECTRIC & ENERGY SYSTEMS CO., LTD.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, ABB ENTERPRISE SOFTWARE INC.,**
*Defendants-Appellees*

---

2021-1009

---

Appeal from the United States Court of International Trade in No. 1:19-cv-00058-MAB, Judge Mark A. Barnett.

---

Decided: October 4, 2021

---

RON KENDLER, White & Case LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DAVID EDWARD BOND.

KELLY A. KRYSTYNIAK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, LOREN MISHA PREHEIM; DAVID W. RICHARDSON, Office of the Chief Counsel, United States Department of Commerce, Washington, DC.

MELISSA M. BREWER, Kelley Drye & Warren, LLP, Washington, DC, argued for defendant-appellee ABB Enterprise Software Inc.  Also represented by ROBERT ALAN LUBERDA, DAVID C. SMITH, JR.

―――――――――――――

Before NEWMAN, REYNA, and HUGHES, *Circuit Judges*.

REYNA, *Circuit Judge*.

Hyundai Electric & Energy Systems Co. appeals a judgment of the U.S. Court of International Trade sustaining the U.S. Department of Commerce's final results in the fifth administrative review of the antidumping duty order on large power transformers from the Republic of Korea. Hyundai challenges Commerce's decision to cancel verification on the grounds that the information submitted by Hyundai was unverifiable, Commerce's reliance on facts otherwise available, and Commerce's use of an adverse inference in selecting from among the facts otherwise available.  For the reasons stated below, we affirm.

I

The U.S. Department of Commerce ("Commerce") imposes antidumping duties on imported products that are sold or likely to be sold in the U.S. at "less than fair value" ("dumping") when those sales threaten or cause material injury to a U.S. industry.  19 U.S.C. § 1673.  In general, to determine whether such products are sold at less than fair value, Commerce undertakes an investigation to ascertain the difference between the "normal value" of the imported goods, i.e., the sales price in the home market, and the price at which the goods are sold in the U.S.  *Id.* §§ 1677(35), 1677b(a).  If Commerce determines that a company is selling goods in the U.S. for less than their normal value, and if the U.S. International Trade Commission ("ITC") determines that such dumping threatens or causes material

injury to a U.S. industry,[1] Commerce issues an antidumping duty order imposing an appropriate antidumping duty rate to remedy the threat or injury. *Id.* §§ 1673d(a)(1), (b)(1), (c)(2). After Commerce issues such an order, an affected party may request an annual administrative review so that Commerce can update dumping margins, if appropriate, to address continued dumping, if any. *See* 19 U.S.C. § 1675.

Section 1677m governs Commerce's conduct of administrative reviews and defines, in certain respects, how Commerce must treat information submitted by an interested party. For example, if an interested party promptly notifies Commerce after receiving an information request that it is "unable to submit the information requested in the requested form and manner," and (among other things) proposes an alternative form, Commerce must consider the party's proposal and may modify its requirements to avoid an "unreasonable burden" on the party. *Id.* § 1677m(c)(1). Commerce must also notify the interested party of a deficiency in its response and, if practicable, provide the party an opportunity to rectify the deficiency. *Id.* § 1677m(d). In certain circumstances, § 1677m prohibits Commerce from declining to consider submitted information even though it does not comply with all of Commerce's requirements. *See id.* § 1677m(e). That prohibition applies where the information is "necessary to the determination" and all of the following requirements are met:

> (1) the information is submitted by the deadline established for its submission,
>
> (2) the information can be verified,

---

[1] While the respective investigations of Commerce and the ITC are conducted concurrently, this appeal only involves Commerce's less than fair value investigation.

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

*Id.*

Commerce is required to "verify all information relied upon" in making a final determination in an administrative review in certain circumstances, i.e., when a specified domestic interested party files a timely verification request and no verification was conducted in the two immediately preceding administrative reviews. *Id.* § 1677m(i); 19 C.F.R. § 351.307(b)(1)(v). Commerce's regulations also provide that Commerce will conduct a verification when good cause exists. 19 C.F.R. § 351.307(b)(1)(iv). The regulations further set deadlines for the submission of "factual information," which vary depending on the type of information. *Id.* § 351.301(c). For factual information other than the types specified in § 351.301(c)(1)-(4), § 351.301(c)(5) sets a submission deadline of "30 days before the scheduled date of the preliminary results in an administrative review, or 14 days before verification, whichever is earlier." *Id.* § 351.301(c)(5).

Section 1677e applies when information requested by Commerce is incomplete or inaccurate. Under that section, Commerce must make determinations based on "facts otherwise available" when "necessary information is not available on the record," *id.* § 1677e(a)(1), or when a party engages in the following conduct:

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the dead-lines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

*id.* § 1677e(a)(2).[2]

Section 1677e also permits Commerce to draw an adverse inference "in selecting from among the facts otherwise available" when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1)(A). In such a case, Commerce is not required to determine a dumping margin as if the interested party had complied. *Id.* § 1677e(b)(1)(B). Commerce may draw an adverse inference from various sources of information, including the petition, a final determination in the underlying investigation, any previous administrative review, or "any other information placed on the record." *Id.* § 1677e(b)(2). If Commerce properly draws an adverse inference, then it may "use any dumping margin from any segment of the

---

[2]    Section 1677e(a) further specifies that the requirement to rely on facts otherwise available is subject to the requirements in Section 1677m(d), which requires Commerce to provide notice and, if practicable, an opportunity to rectify a deficiency in a party's response to a request for information from Commerce.

proceeding under the applicable antidumping order," *id.* § 1677e(d)(1)(B); it may exercise discretion to apply "the highest" dumping margin if warranted based on "the situation that resulted in the administering authority using an adverse inference," *id.* § 1677e(d)(2); and it is not required to estimate what the dumping margin would have been if the interested party had cooperated or to demonstrate that the dumping margin selected reflects the alleged commercial reality of the interested party, *id.* § 1677e(d)(3).

## II

## A

On October 16, 2017, Commerce initiated its fifth administrative review of the antidumping duty order on large power transformers ("LPTs") from the Republic of Korea for the period of review (i.e., "POR") of August 1, 2016, to July 31, 2017. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 82 Fed. Reg. 48,051 (Oct. 16, 2017) (J.A. 26). Commerce selected Hyundai Heavy Industries Co. as a mandatory respondent. Hyundai Electric & Energy Systems Co. ("Hyundai") later became the successor-in-interest to Hyundai Heavy Industries Co. J.A. 27985 n.1.

On December 13, 2017, Commerce issued its initial questionnaire seeking specific information related to Hyundai's U.S. and home market sales of LPTs during the POR. This case involves two categories of information that Commerce requested from Hyundai, namely product-specific cost information and cost-reconciliation information.

### Product-Specific Cost Information

In Section D of its initial questionnaire, Commerce requested information regarding Hyundai's costs of producing LPTs. *See* J.A. 205–69. That section specifically sought information about, *inter alia,* Hyundai's cost accounting system, including for example "the level of product specificity over which [Hyundai's] cost accounting system

normally captures production costs." J.A. 211. It also asked Hyundai to "[i]dentify and quantify" the "differences between the reporting methodology and the normal books and records." J.A. 217. In other words, Commerce sought information regarding any discrepancies between the cost data reported to Commerce and the cost data actually kept in Hyundai's normal books and records. *Id.* In response, Hyundai disclosed that it had shifted costs among projects in the ordinary course of business to show that each LPT project was profitable. J.A. 7687; Appellant's Br. 30.

On May 24, 2018, Commerce issued a supplemental questionnaire. J.A. 16748–50. In question 9, Commerce referenced Hyundai's cost shifting and requested a detailed disclosure of "the total costs recorded in [Hyundai's SAP accounting system], the total costs reported to the Department, and an itemization of the materials and related costs making up the difference" for each sale in the U.S. market and home market. J.A. 16748. Commerce also asked Hyundai to "[e]xplain in detail how [it] was able to identify and quantify the costs that were miss-recorded [sic] in [its] SAP system" and to "show how the adjustments in each project offset each other and reconcile in total." J.A. 16748–49.

In response, Hyundai submitted Attachment SD-16, which included (i) a "Breakdown of Direct Material Cost by Material Type" on an annual basis from 2015 to 2017; (ii) a "Monthly Direct Material Cost" for the same three years; and (iii) a "Breakdown of Direct Material Cost by Project Number" for the month of March 2016, which preceded the period of review. J.A. 16909–12. Hyundai explained that the attachment showed the differences between the LPT projects' SAP bills of materials and their actual bills of materials. J.A. 16788. Hyundai further explained, "To pre-pare the reconciliation, Hyundai downloaded the BOMs [i.e., bills of materials] from both systems and by computer program was able to trace all materials in the [actual] BOMs to the SAP BOMs." J.A. 16788–89.

On July 12, 2018, Commerce sent Hyundai a second supplemental questionnaire. J.A. 25047–50. Commerce explained, "You did not provide a response to question 9," and it listed a schedule of required items:

a. Total POR costs recorded in SAP and the total POR costs reported to [Commerce]. Ensure the total POR cost reported to [Commerce] agrees [with Hyundai's cost of production] file.

b. For the difference between the SAP costs and the reported costs . . . itemize each specific material and conversion cost item which make up that difference. For example, identify all parts and raw materials that are included or excluded from other LPTs.

c. For all SAP and reported cost itemized material and [conversion] cost differences, show which LPT project the itemized items were shifted to / from in SAP.

d. Explain in detail how [Hyundai was] able to identify and [quantify] the costs which were missrecorded [sic] in SAP.

J.A. 25049.

Hyundai responded again on July 23, 2018. J.A. 27355–57, 27366–86. This time, Hyundai provided Attachment 2SD-1, a worksheet that divided the total cost differences by LPT project for reconciliation purposes into six categories: "(1) expenses recorded after the year of cost of goods sold ('COGS') recognition for the project; (2) recalculated silicon steel cost; (3) recalculated other material costs; (4) material costs incurred after the year of COGS recognition; (5) recalculated scrap; and (6) recalculated fixed overhead." J.A. 27355–56, 27369. For a single category, "other material costs," Attachment 2SD-1 purported to show given costs shifted to particular projects and

described the corresponding types of materials. *See* J.A. 27370.

Regarding silicon steel costs, Hyundai explained that, "[u]nlike all other materials, silicon steel is fungible and it is not possible to trace the projects to and from which silicon steel cost might have been shifted." J.A. 27356. Hyundai further stated that "actual silicon steel consumption is not recorded on a project basis, and only can be calculated manually by reference to the silicon steel processing reports." *Id.* In Attachment 2SD-1, Hyundai provided data on shifting of steel costs for one sample LPT project. J.A. 27369–70. Hyundai also referenced earlier-submitted Attachment SD-18, which compared, for one LPT project, the "projected consumption" (calculated by engineers to "achieve the desired electrical properties") and the "actual consumption" as stated in the steel processing report. J.A. 16789–90, 16925. Hyundai explained that "there can be differences between the core steel purchased for a particular transformer and the [silicon] steel consumed," and it disclosed the "yield loss" for the sample provided in Attachment SD-18. J.A. 16789–90. With respect to the remaining four categories, Hyundai disclosed aggregate cost data.

### Cost-Reconciliation Information

In its initial questionnaire, Commerce asked Hyundai to provide worksheets, similar to the sample Commerce provided, "that illustrate how the costs reported on the financial statements reconcile to the general ledger or trial balance, to the cost accounting system (*i.e.*, the source used to derive the reported costs), and to the reported costs." J.A. 216–18. Hyundai responded by providing a worksheet called WS2 in Attachment D-20 that identified nine categories of costs and, for each category, distinguished between "Subject Merchandise" and "Non-subject Merchandise." J.A. 8033; *see also* J.A. 8.

Commerce issued a supplemental questionnaire that requested Hyundai to "[d]iscuss how [it] separated cost of sales on tab WS2 between MUC and non-MUC"[3] and to "[d]emonstrate and provide supporting documentation for the MUC and non-MUC breakout for [transformers]." J.A. 16750. Hyundai responded by providing Attachment SD-23, which showed the same information as that provided in Hyundai's initial response. J.A. 17076.

Subsequently, after Commerce issued its preliminary results, Hyundai submitted a case brief in which it clarified for the first time that the line item for non-MUC for transformers included the cost of manufacturing for "1) non-subject merchandise; 2) third-country sales; 3) U.S. shipments that did not enter the United States during the POR; and, 4) home market shipments made outside the POR and window periods." J.A. 28309. Hyundai did not separately identify these reconciliation items in its questionnaire responses.

B

Commerce issued its preliminary results on August 31, 2018, assigning Hyundai a 60.81 percent *ad valorem* antidumping margin, the same margin assigned in the previous administrative review. J.A. 27985–8008. Commerce explained that it used an adverse inference in selecting from the facts otherwise available because Hyundai "had failed to cooperate by not acting to the best of its ability to comply with a request for information to reconcile reported costs at the individual LPT project-level to its normal records." J.A. 27998. Commerce found that "[t]he missing information [wa]s necessary for Commerce to analyze Hyundai's section D responses and to calculate a margin."

---

[3]    "MUC" refers to merchandise under consideration, and "Non-MUC" refers to merchandise not under consideration.

*Id.* Specifically, regarding product-specific costs, Commerce explained that Hyundai "failed to provide part-specific itemized cost differences." J.A. 28002–03. In submitting Attachment 2SD-1, Hyundai "only provided the cost differences in aggregate" and averred that "it [wa]s not possible to trace" cost differences for silicon steel, the largest material input. J.A. 28003.

Commerce also explained, regarding cost reconciliation, that Hyundai had "failed to provide its cost reconciliation in the format requested" and failed to adjust the cost of production figures from fiscal year cost of goods sold to period-of-review cost of goods sold. *Id.* Commerce concluded that, despite having "many opportunities," Hyundai "failed to provide support for the cost differences or an accurate cost reconciliation" and therefore "Commerce was left with unreliable cost data." J.A. 28004. Commerce also stated that "the information submitted by the established deadline cannot be verified," *id.*, and shortly thereafter it sent Hyundai a letter confirming that it had decided not to conduct a verification. J.A. 28097.

On April 12, 2019, after the parties had submitted their case briefs following Commerce's preliminary results, Commerce published its final results and an accompanying issues and decision memorandum. J.A. 28295–321. Commerce again assigned Hyundai a dumping margin of 60.81 percent *ad valorem*, J.A. 28320, and it "continue[d] to find that Hyundai failed to provide the information as requested, or to sufficiently address its manipulation of transformer costs, within its own normal books and records," J.A. 28301.

Commerce first addressed the reliability of Hyundai's product-specific costs and found that Hyundai inadequately responded to the initial questionnaire by "only identif[ying] the cost difference in aggregate for each [LPT] project" and by "fail[ing] to fully distinguish each quantity and value difference between its SAP[] costs and the costs

reported to Commerce by cost type (*i.e.*, raw materials, direct labor, *etc.*)." J.A. 28304. It further found that Hyundai inadequately responded to Commerce's supplemental questionnaire because "Hyundai again identified only the total POR cost differences" and, for one sample month outside the period of review, "Hyundai provided a table showing the difference between each project's SAP[] BOM and the [actual] BOM, and not between SAP[] and the reported costs." J.A. 28304.

Commerce likewise found that Hyundai inadequately responded to its second supplemental questionnaire by providing the requested level of detail for "only one of the six categories of cost, *i.e.*, other materials, that it identified as being manipulated." J.A. 28305. Regarding the silicon steel category, Commerce explained that "Hyundai failed to demonstrate and support how each project's reported silicon steel consumption quantities and per-unit input values were calculated, that they truly represent actual consumption, and how the per-unit input valuations differed from those recorded in SAP[]." *Id.* "Hyundai simply attributed the difference in quantities between the silicon steel processing report and the engineering calculations to yield losses"; however, Commerce rejected that attribution because "[y]ield losses are typically based on the difference between the consumption for the job and the actual amount in the final product, not between consumption at a preliminary processing stage and theoretical quantities." J.A. 28306. Commerce further found that Hyundai had failed to show cost differences as requested for the remaining four categories of costs identified by Hyundai. *Id.*

Commerce also rejected Hyundai's argument that the information provided was sufficient because "Commerce has previously relied on the very same information which Commerce now considers unreliable." *Id.* Commerce explained that in the earlier proceedings "Hyundai claimed that it was stopping the practice, however the shifting reoccurred in this segment." *Id.* Further, Commerce found

reason in this administrative review to "take a closer look at [Hyundai's] continuing practice and [its] attempt to correct the manipulation" because, in the earlier proceedings, unlike these, "Hyundai indicated the manipulation was limited to select parts of the SAP[] system only." J.A. 28307.

Commerce then turned to Hyundai's cost reconciliation. *Id.* It found that Hyundai provided a cost reconciliation in response to Commerce's initial questionnaire that "a) did not comply with the format requested and b) did not provide requested details." J.A. 28309. Specifically, Commerce had asked Hyundai to "[l]ist each category of non-MUC separately" and reiterated that request in a supplemental questionnaire. *Id.* In the reconciliations Hyundai provided, however, Hyundai "did not provide details on each category of non-MUC" but instead "included a single line titled 'Non-MUC from Transformer' as a reconciling item with no explanation or support." *Id.* Commerce found it was not until Hyundai's case brief after the preliminary results that Hyundai explained that the single reconciling item included "1) non-subject merchandise; 2) third-country sales; 3) U.S. shipments that did not enter the United States during the POR; and, 4) home market shipments made outside the POR and window periods." *Id.* Commerce rejected as "nonsensical" Hyundai's argument that details on these [non-MUC] items are not relevant because Commerce would ultimately exclude them." J.A. 28310. Commerce stated that it "routinely analyze[s] costs excluded from reporting and request[s] supporting documents and detailed explanations of why the cost is appropriate to exclude." *Id.* Commerce also explained that, in a case such as this "where the respondent admits to manipulating its normal books and records, and the excluded costs include LPTs sold to third countries and merchandise made at the same facilities, it was even more crucial for Commerce to identify the detailed reconciling categories and related costs." *Id.*

Commerce next found that Hyundai had not acted to the best of its ability, and thus an adverse inference was warranted. J.A. 28312. Commerce explained that "Hyundai failed to provide the basic information necessary to perform the dumping calculations as described in the preceding comments and to substantiate what the actual costs were for its transformers." J.A. 28317. Hyundai's failure to provide the basic information, Commerce found, prevented Commerce from calculating an accurate antidumping margin and from reversing the effects of Hyundai's cost shifting. *Id.* Commerce found that Hyundai's failures to disclose the requested information rendered verification "meaningless," and it rejected Hyundai's argument that it should conduct verification to accept new information that would establish the accuracy of its data and resolve the issues stemming from its cost shifting, J.A. 28313.

C

On May 8, 2019, Hyundai sought judicial review in the U.S. Court of International Trade ("CIT"). Hyundai challenged certain aspects of Commerce's final determination, including its (1) cancellation of verification, (2) application of facts otherwise available, and (3) use of an adverse inference. *Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303, 1307 (Ct. Int'l Trade 2020). On August 4, 2020, the CIT issued a decision sustaining Commerce's final results in their entirety. *Id.* The CIT first determined that substantial evidence supported Commerce's decisions to rely on facts otherwise available and cancel verification. *Id.* at 1309–18. The CIT pointed to Commerce's findings that Hyundai had failed to provide adequate information on product-specific costs and cost reconciliation. *Id.*

Regarding Hyundai's product-specific cost disclosures, the CIT noted Commerce's finding that Hyundai had only provided adequate product specific cost information for one

of the six cost categories identified by Hyundai, namely other material costs. *See id.* at 1310–13.  The CIT also pointed to Commerce's finding that Hyundai had not tracked the shifting of silicon steel costs from one project to another and had not properly accounted for the differences between the amounts reported in the silicon steel processing reports and the engineering documents.  *Id.* at 1313–14.  The CIT explained, as Commerce had found, Hyundai had also failed to adequately report product-specific costs on the four remaining cost categories identified by Hyundai; instead, Hyundai had provided sample and aggregate data.  *Id.* at 1314–15.

Regarding Hyundai's cost-reconciliation disclosures, the CIT rejected Hyundai's arguments that it had provided information satisfying Commerce's requests and that Commerce did not ask Hyundai for the level of detail that Commerce contends it did.  *Id.* at 1316–17.

The CIT also determined that substantial evidence supported Commerce's use of an adverse inference.  *Id.* at 1318–20.  The CIT rejected Hyundai's argument that Commerce, in determining that Hyundai had failed to comply to the best of its ability, improperly overlooked the limitations of Hyundai's cost accounting system.  *Id.* at 1318–19.  The CIT reasoned that, although Hyundai did not adequately report its cost-reconciliation and product-specific costs, that information "had to be available to Hyundai if it had accurately recaptured all costs—and indeed, in limited instances, Hyundai provided discrete samples detailing the adjustments for short periods of time and for limited categories of expenses." *Id.* at 1319.

Hyundai appealed.   We have jurisdiction under 28 U.S.C. § 1295(a)(5).

### III

We apply the same standard of review applied by the CIT.  *Dupont Teijin Films USA, LP v. United States*,

407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005). Accordingly, we uphold a determination by Commerce unless it is "unsupported by substantial evidence . . . or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Dupont*, 407 F.3d at 1215; *SNR Roulements*, 402 F.3d at 1361; *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

A

Commerce's decision to rely on facts otherwise available was supported by substantial evidence and not contrary to law. Section 1677e instructs Commerce to rely on facts otherwise available when, for example, "necessary information is not available on the record." 19 U.S.C. § 1677e(a)(1). Commerce explained that information pertaining to both product-specific costs and reconciliation was missing from the record and prevented it from understanding Hyundai's cost shifting and determining an antidumping margin. Regarding Hyundai's product-specific costs, Commerce itemized the specific information it needed from Hyundai in the second supplemental questionnaire. In response, Hyundai identified six categories of costs but only provided the requested level of detail for a single category, other materials.

With respect to the silicon steel category, Hyundai failed to provide the details requested. Instead, it explained that it was "not possible to trace" cost shifting for silicon steel. Hyundai also attributed discrepancies between projected consumption and actual consumption to "yield losses." But as Commerce pointed out, Hyundai's comparison of the projected consumption to the silicon steel

processing reports would not result in a yield loss figure. And for the four remaining cost categories, Commerce observed that Hyundai had provided aggregate-level information that did not satisfy Commerce's request.

As for Hyundai's cost reconciliations, Hyundai provided the same single line item twice, and only after Commerce's preliminary results did Hyundai articulate what that line item included. Commerce's determination that necessary information was missing from the record and its decision to rely on facts otherwise available were supported by substantial evidence.

Hyundai argues that Commerce did not actually request details on each category of non-MUC for purposes of cost reconciliation. Appellant's Br. 35. We are not persuaded. In its supplemental questionnaire, Commerce asked Hyundai to "[d]iscuss how you separated cost of sales on tab WS2 between MUC and non-MUC" and to "[d]emonstrate and provide supporting documentation for the MUC and non-MUC breakout for [transformers]." J.A. 16750. By their plain terms, these requests seek more detail than just the "category" of non-MUC as Hyundai contends.

Hyundai also contends that it in fact satisfied Commerce's requests to fully demonstrate Hyundai's cost shifting. Appellant's Br. 37. But the record belies Hyundai's argument. While there is no doubt that Hyundai provided certain information relating to its cost-shifting, we are not persuaded that Hyundai disclosed information that satisfied Commerce's requests. Indeed, Hyundai provided the level of detail that Commerce requested with respect to one of the six cost categories, namely "other materials," that Hyundai identified in its response to Commerce's second supplemental questionnaire. Hyundai's repeated disclosure of partial, aggregate, or sample information rather than complete and itemized information establishes that Commerce's decision to rely on facts otherwise available

was reasonable and supported by substantial evidence.  *See* 19 U.S.C. § 1677e(a)(1).

B

Commerce's decision to cancel verification was also supported by substantial evidence and not contrary to law. Section 1677m(e) provides that Commerce is not obligated to conduct verification when, for example, the information cannot be verified, the information is so incomplete as to be unreliable, or the interested party has not acted to the best of its ability to meet Commerce's requirements.  19 U.S.C. § 1677m(e).  Such is the case here because Hyundai failed to provide the information necessary for Commerce's analysis despite being given multiple opportunities to do so. Where necessary information is absent, Commerce need not conduct a verification in an attempt to obtain the missing information.  *AMS Assocs., Inc. v. United States*, 719 F.3d 1376, 1380 (Fed. Cir. 2013) (concluding that Commerce did not err in declining to conduct verification where, "[w]ithout verifiable information on those matters, Aifudi was necessarily unable to carry its burden"); *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("Commerce was unable to verify the index because Sea-line did not provide the correct source of the data.").  Indeed, as the CIT has explained, consistent with Commerce's objective to verify the accuracy and completeness of submitted factual information under 19 C.F.R. § 351.307(d), Commerce typically accepts new information at verification under limited circumstances, i.e., "only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record.'"  *Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333, 1356 (Ct. Int'l Trade 2017).  Hyundai does not persuasively show that these circumstances are present.

Hyundai argues that Commerce erred in finding Hyundai's cost information unverifiable because, in the past, Commerce conducted verifications on submitted information similar to that submitted by Hyundai in this case. Appellant's Br. 29. We are not persuaded. We have rejected the notion that "Commerce is forever bound by its past practices." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016). Instead, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao*, 766 F.3d at 1387. Here, Commerce articulated sound reasons for seeking more detailed information regarding Hyundai's cost-shifting in this administrative review than in prior reviews, including its observation that cost shifting had a larger impact on this administrative review. J.A. 28306–07. Such concerns support the reasonableness of Commerce's requests for a greater amount of detail in this administrative review.

C

Commerce's decision to use an adverse inference in selecting from among the facts otherwise available is also reasonable and supported by substantial evidence, and not contrary to law. The statement of administrative action on the Uruguay Round Agreements Act provides that "the purpose of the adverse inference provision is to encourage future cooperation and ensure that a respondent does not obtain a more favorable antidumping rate by failing to cooperate." *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014) (citing H.R. Rep. No. 103–316, at 200 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199). An adverse inference is warranted where an interested party fails to act to the best of its ability in responding to Commerce's request. 19 U.S.C. § 1677e(b)(1)(A); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The "best of its ability" standard requires an interested party to "put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries in an investigation." *Nippon*, 337 F.3d at 1382; *see also Mukand*, 767 F.3d at 1306. The standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon*, 337 F.3d at 1382. "An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made . . . ." *Id.* at 1383.

We have held that an adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response. *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) ("Borusan had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified Borusan of that defect. § 1677m(d) does not require more."). Hyundai did so here when, in response to Commerce's second supplemental questionnaire, it only provided the requested level of detail for one out of six cost categories of product-specific cost information. It also did so when it twice provided the same single line item for non-MUC with respect to transformers in its responses pertaining to cost reconciliation. Given these circumstances, Commerce's determination that Hyundai did not act to the best of its ability in responding to Commerce's requests is supported by substantial evidence.

Hyundai contends that it acted to the best of its ability in responding to Commerce's requests. Hyundai states that it engaged in a "comprehensive effort to provide [Commerce] with" cost reconciliation information. Appellant's Br. 48. Hyundai also contends that it could not have been more forthcoming in providing Commerce with product-specific cost tracing given the nature of its accounting. *Id.* at 49. We are not persuaded. To the extent that the shortcomings of Hyundai's responses are attributable to its record keeping, that alone does not avoid an adverse

inference. *Nippon*, 337 F.3d at 1382. That is all the more true where, as here, Commerce clearly and repeatedly requested the information and identified the defects in Hyundai's responses, and the information that was ultimately missing from the record was foundational to Commerce's ability to perform the antidumping duty calculations in a sound manner. *See, e.g.*, *Mukand*, 767 F.3d at 1307 ("Product-specific information is a necessary element in the dumping analysis, and it is standard procedure for Commerce to request product-specific data in antidumping investigations. It was thus reasonable for Commerce to expect from Mukand more accurate and responsive answers to the questionnaire.").

## IV

We hold that Commerce's determinations to rely on facts otherwise available, to cancel verification, and to draw an adverse inference in selecting from among the facts otherwise available are supported by substantial evidence and otherwise not contrary to law. We therefore affirm the CIT's decision sustaining Commerce's final results. We have considered Hyundai's remaining and arguments and find them unpersuasive.

## AFFIRMED

### COSTS

No costs.